BENZ, Respondent, vs. ZOBEL, Appellant.

*September 13—November 15, 1949.*

For the appellant there was a brief by *Reed, Born, Nesbitt & Kay* of Ripon, attorneys, and *Lorin L. Kay* of Richland Center of counsel, and oral argument by *Mr. Kay.*

For the respondent there was a brief by *Lehner & Lehner* of Princeton, and oral argument by *Philip Lehner.*

ROSENBERRY, C. J. In his complaint the plaintiff alleges:

"1. That on September 16, 1946, he entered into a share cropper's contract with the defendant, which is hereby made part of this complaint by reference, each party having a copy.

"2. That under the terms of said contract the defendant agreed to furnish his 257-acre farm in the township of Brooklyn, together with the stock and machinery, which machinery he represented to be in good working condition and in a good state of repair and in good working condition.

"3. That the income from said farm was to be divided, so that the plaintiff would receive 40% and the defendant 60%, and the expenses were prorated at the same rate.

"4. That the defendant furnished 70 tons of alfalfa hay, 2,000 bushel of oats, one silo filled to within 6 feet of the top, and another silo filled to within 9 feet of the top, which the plaintiff agreed to replace at the end of his contract on October 1, 1947.

"5. That said contract expired on October 1, 1947, and that the defendant informed the plaintiff that he did not intend to work the farm for another year, and that the parties then agreed that they would continue under said contract until April 1, 1948. That on January 13, 1948, the defendant unexpectedly summoned the plaintiff to the office of his attorney and insisted on terminating said oral agreement forthwith, and require the plaintiff to work for him as a hired man for wages until April 1, 1948, on the representations hereinafter set forth.

"6. That on said date the defendant induced the plaintiff to sign a settlement of which Exhibit 'A' hereto annexed is a copy and made part hereof. That plaintiff was induced to sign said settlement on the defendant's representation as a fact he was legally liable for and obliged to pay for all of the silage, hay, and oats that was then on hand on October 1, 1946, which the contract required him to leave as of October 1,

1947, and called in another man to corroborate said representation as a fact, and by so doing charged him with all the feed that was fed to all the livestock on the farm from October 1, 1947, until January 1, 1948, except that the defendant paid for his share of the commercial feed that was purchased. And the defendant further represented to him that unless he promptly signed that settlement that he would forfeit all his rights under the contract.

"7. That the machinery which was furnished by the defendant on the farm was in such a bad condition and so old that much of it was junk and unfit for use, and that by reason thereof the plaintiff was obliged to hire a tractor and mower to cut hay, at an expense of $65; had to hire a hay baler to have it baled, at a cost of $296; had to hire the grain sowed, at a cost of $30; and the plaintiff was obliged to pay for 40% of the repair bills on the old machinery, amounting to $517.42 dollars, all of which the defendant refused to pay on the representation that the defendant was not liable therefor.

"8. That under this contract as extended he paid a hired man the sum of $60. That there is due to the plaintiff a balance of about $10 for the feed on some hens which the defendant removed for his personal use; and rent for small tools and corn sheller in January, 1948, amounting to $15.

"9. Alleges that said settlement Exhibit 'A' is void because obtained by misrepresentations, upon which the plaintiff had a right to rely and did rely, and was deceived thereby to his damage. That by reason of the defendant's failure to carry out his part of said contract and by reason of said misrepresentations, the plaintiff sustained a substantial loss for the recovery of which he brings this action."

From an inspection of the complaint it is obvious that two causes of action are intermingled. However, the defendant did not move to make the complaint more definite and certain. *Karass v. Marquardt* (1939), 230 Wis. 655, 284 N. W. 514. Nor was any question raised in regard to the duplicity of the complaint during the course of the trial. The special verdict dealt with both causes of action and the facts and damages were separately found. While the defendant raised no question in regard to duplicity, in order to deal with the questions

raised here we shall consider the two causes of action separately.

(1) We shall designate as the first cause of action the one which is for damages for alleged false representation inducing the plaintiff to enter into the farm contract.

By the second paragraph of the complaint it is alleged:

"That under the terms of said contract the defendant agreed to furnish his 257-acre farm in the township of Brooklyn, together with the stock and machinery, which machinery he represented to be in good working condition and in a good state of repair and in good working condition."

In paragraph 7 it is alleged:

"That the machinery which was furnished by the defendant on the farm was in such a bad condition and so old that much of it was junk and unfit for use, and that by reason thereof the plaintiff was obliged to hire a tractor and mower to cut hay, at an expense of $65; had to hire a hay baler to have it baled, at a cost of $296; had to hire the grain sowed, at a cost of $30; and the plaintiff was obliged to pay for 40% of the repair bills on the old machinery, amounting to $517.42 dollars, all of which the defendant refused to pay on the representation that the defendant was not liable therefor."

Upon the trial the jury found that the defendant represented to plaintiff that all the machinery on the farm was in good working condition; that such statement was false; that the plaintiff believed and relied upon the truth of such statement; that the plaintiff in the exercise of such care as is ordinarily exercised by persons of his education, intelligence, and experience should not have discovered the falsity of such statement before entering into the agreement on October 1, 1946, and assessed the plaintiff's damages for the false representation in regard to the condition of the machinery at $426.90.

It appears without dispute that prior to the execution of the farm contract that plaintiff had been on the farm more than once and that he had occasion to see the machinery. It does

not appear that anything was done to prevent the plaintiff from making such examination of the machinery as he chose. There was no concealment in that respect.

The contract provided:

"First party to furnish four work horses, machinery and tools now there, one tractor now there, . . ."

It further provided:

"The following items of expense are to be paid 60% by first party and 40% by second party: . . . Tractor fuel and oil, new parts and repairs on tractor or other machinery. . . ."

Two weeks after the execution of the farm contract plaintiff took possession of the premises and commenced performance. It appears without dispute in the language of the testimony that every two or three months the parties figured up and squared their incidental accounts. Squaring accounts means the same thing as settling accounts. On the evening of October 13, 1947, the parties for the last time squared or settled their incidental current accounts.

It also appears that from time to time transactions were had between the parties relating to the extra expense to which the plaintiff claimed he was put by reason of the defective machinery. Some of these claims were allowed by the defendant, some were not. It nowhere appears that upon any occasion before or after the plaintiff commenced performance of the contract did plaintiff claim that he had been deceived by reason of false representations made to him by the defendant. He not only settled accounts but he paid his share of the cost of repairs in accordance with the terms of the contract. If, as is alleged in the complaint, the machinery was in such bad condition and so old that much of it was junk and unfit for use, the plaintiff must have discovered that fact when he saw the machinery before he signed the contract, and he cer-

tainly saw it when he moved upon the farm, took possession of the machinery, and commenced to use it in the performance of the farm contract.

It does not appear that the plaintiff made any claim that the machinery had been misrepresented to him or that he had been induced to enter into the contract by reason of false statements made by the defendant until after the settlement between the parties had on January 13, 1948.

There is a well-established principle of law that a party defrauded may retain what he has received, stand to his bargain, and recover for the loss caused him by the fraud. However, he cannot maintain an action for the original wrong practiced on him where with full knowledge of all the material facts he does an act which indicates his intention to stand to the contract and waive all right of action for the fraud. In *Thompson v. Libby* (1886), 36 Minn. 287, 289, 31 N. W. 52, it is held:

". . . a person who has discovered the fraud while the contract is still wholly executory to go on and execute it, and then sue for the fraud, looks very much like permitting him to speculate upon the fraud of the other party. It is virtually to allow a man to recover for self-inflicted injuries. The fraud is really consummated, and the damages incurred, by the acceptance of the property and paying for it. And if this is done after the fraud is discovered, the purchaser cannot say that he sustained this damage by reason of the fraud."

Cases are collected in 8 L. R. A. (N. S.) 452. See also *Simon v. Goodyear Metallic Rubber Shoe Co.* (6th Cir. 1900), 105 Fed. 573; *Kingman & Co. v. Stoddard* (7th Cir. 1898), 85 Fed. 740.

There is a division of authority upon this proposition, but the better reasoned and greater weight of authority supports the conclusion stated. There is no case in Wisconsin exactly in point, although there are a number of cases that support the proposition in principle. In *Pfeiffer v. Marshall* (1908),

136 Wis. 51, 62, 116 N. W. 871, it is held that taking any step to enforce a contract is a conclusive election not to rescind it on account of anything then known to the party so moving and he will not be heard to say he did not intend to waive.

In *Grant Marble Co. v. Abbot* (1910), 142 Wis. 279, 124 N. W. 264, it was held that one who seeks to rescind must act promptly upon discovery of the facts which he claims entitle him to rescission, and must take no steps in affirmance of the contract.    It was also held in that case that one cannot rescind a contract for mistake due to his own want of ordinary care. See note on waiver of deceit action by continued performance, 34 Michigan Law Review, 384, and cases cited.

In this case the plaintiff not only is. chargeable with the knowledge of the condition of the machinery at the time he signed the contract but after performing the contract for one year, which was the original contract period, he renewed the contract verbally and continued performance.    Although the defendant terminated the contract there was paid to plaintiff between October 1, 1947, and January 1, 1948, the date to which the settlement was made, $2,304.18 as his share of the proceeds of the farm.    It is evident that the plaintiff regarded the contract as an advantageous one, made no objections or claim of fraud until after he had signed the settlement and received the amount for which he agreed to settle,—$600. The condition of the machinery was open and obvious.    Under such circumstances it is considered that the plaintiff had no right to rely on the statements made by the defendant in the course of negotiations where plaintiff had an opportunity to ascertain the condition of the machinery, and he cannot now maintain an action against the defendant for alleged fraud inducing the making of the contract. *Mosher v. Post* (1895), 89 Wis. 602, 62 N. W. 516.    61 A. L. R. 511, Note *d,* Misrepresentations as to obvious facts.

(2) The second cause of action has been set out (see infra) in paragraphs 5, 6, and 9 of plaintiff's complaint.

Plaintiff on January 13, 1948, entered into a contract of settlement which so far as material here is as follows:

"It is agreed by and between Edgar H. Zobel of Ripon, Wisconsin, and Ray Benz of Green Lake, Rural Route, Wisconsin, as follows:

"1. The farm contract which expired October 1, 1947, is hereby abolished and terminated as of January 1, 1948.

"2. As a full and complete and final settlement of accounts between the parties Edgar H. Zobel will as of even date pay Ray Benz six hundred ($600) dollars and in consideration of such payment said Ray Benz hereby releases and forfeits all claim to hay, grain, feed, and livestock on said farm."

The remainder of the settlement contract refers to matters not now in issue.

The plaintiff does not indicate in his complaint upon what ground he claims the contract is void except as alleged in paragraph 9 of the complaint already set out. As found by the jury the representations made by the defendant were as follows:

(a) That he (plaintiff) must replace on January 1, 1948, all the feed as required by the contract as of October 1, 1947.

(b) That if the plaintiff did not settle on January 13, 1948, he would lose all his rights under the contract.

There is no dispute in regard to the facts involved. The contract provided that the plaintiff should work the farm for the term of one year commencing on October 1, 1946. The contract then provided in considerable detail what work should be done and how it should be done, and what was to be furnished by each party. It provided for the expenses which were to be shared jointly, sixty per cent by the defendant and forty per cent by the plaintiff. It further provided:

"And in consideration of the full and faithful performance of this agreement according to its full terms on the part of the second party, said first party [defendant] agrees when so performed, at the end of the lease year or any extension lease year, to pay said second party forty per cent (40%) of all

income from said farm (not including straw, which can only be fed out or left on the premises, or income from sale of specific items that are the sole property of first party) and whenever the second party [plaintiff] shall have performed his full part of this contract as agreed therein and the crops are ready for market, such payment and division shall be made by the party of the first part, or his agent, on the premises. The hay to be divided, 60% to first party and 40% to second party after an amount is left in the barn equal to the amount and kind found therein on said farm October 1, 1946. Silos to be left filled as found on October 1, 1946 (except that in case of the silo on the Brooks farm, which farm is now cash rented by first party, first party reserves certain acreage of standing corn for the time when the Brooks farm is returned to the owner, in place of the filled silo found on October 1, 1946). Second party to leave as much corn and stalks as he finds thereon October 1, 1946, the balance to be divided 60% to first party and 40% to second party, and in case second party fails to leave amounts equal thereto as above stated, first party shall have difference in value in cash, stock or produce from the share of second party at his option. . . .

"The increase of stock and the income from the farm to be divided sixty per cent (60%) to first party and forty per cent (40%) to second party on the following items:

"Cattle and calves above the original number, sheep and lambs above the original number, hogs and pigs above the original number, poultry (except eggs—see poultry note), milk and cream checks (checks to be issued direct to each party), wool (to be sold in name of first party), AAA farm payments and adjustments (checks to be issued direct), and crops raised (amounts above those originally furnished by first party)."

In September, 1947, it was agreed that the plaintiff would stay on the farm after October 1, 1947. There seems to have been some doubt as to whether the plaintiff would continue for the remainder of the year. On December 30, 1947, the parties took an inventory. At that time the plaintiff made it clear that he did not intend to stay beyond April 1, 1948. The defendant testifies that he told the plaintiff on Decem-

ber 30th that he wanted to take an inventory and square things up, and "we will have a settlement on the basis of the old contract and I will let you know when I am ready for that." According to the testimony of the defendant he notified the plaintiff on the evening of January 12th to come to the Nesbitt law office the next day. The plaintiff testified that when he got to the Nesbitt office that the defendant told him he wanted to make a settlement on the old contract as of January 1, 1948, and wished that the plaintiff would work as a hired man from then on. Plaintiff testified that this was the first intimation he had that the defendant wanted to end the oral agreement to work under the old contract; that the defendant had a paper figured out showing the amount of money the plaintiff had coming, which was $200. He further testified, "They said that I would have to settle it or I would lose all my rights, I would lose everything." After two hours of negotiations the plaintiff left at noon and went to his home, intending to talk the matter over with his wife and his father-in-law and consult his lawyer. He talked with his wife, filed his income-tax return, but did not see his lawyer because the lawyer was too busy, and returned to the Nesbitt office about two o'clock. The negotiations continued until five o'clock when the settlement contract was signed. The parties agreed upon the amount of produce and stock on the farm on October 1, 1947, and on December 30, 1947. During the course of the negotiations the original amount which the defendant admitted was owing to the plaintiff was $200. Between October 1, 1947, and January 1, 1948, the plaintiff was paid his share of the farm produce, amounting to $2,304.18. Finally in the course of the negotiations the figure of $549 and a few cents was arrived at, when the plaintiff, after calling his wife on the telephone, offered to take $600 and a check was handed to him for that amount which he cashed the next day and the proceeds of which he has retained. The main controversy during the negotiations for settlement on Janu-

ary 13, 1948, related to whether the plaintiff under the contract was required to leave the same amount of produce there on January 1, 1948, that was there on October 1, 1947. There was no division of produce that was on the farm on October 1, 1947, and from then until January 1, 1948, the stock was fed out of the undivided feed. The parties agreed on the amount there on the respective dates. The plaintiff's contention was that he was liable for only forty per cent of the feed fed between those dates while the defendant contended that he was required under the contract to leave the whole amount there or compensate for it.

Upon this branch of the case the court submitted two questions to the jury:

Did the defendant Edgar H. Zobel, or his agents, on the 13th day of January, 1948, represent to the plaintiff as a fact: (a) That he must replace on January 1, 1948, all the feed as required by the contract as of October 1, 1947? Answer by the court on stipulation of the parties: "Yes." (b) That if the plaintiff did not settle on January 13, 1948, he would lose all his rights under the contract? Answer by the jury: "Yes."

With respect to question 2 (relating to falsity of statements made) the court instructed the jury as follows:

"In your answer to the subdivisions of this question it is not whether Edgar H. Zobel or his agents believed any statements which he or they made to be true. If they were false you must so find irrespective of whether or not they were made in good faith honestly believing them to be true."

No instruction was given the jury regarding the essential elements of fraud. While the instruction as given was correct as far as it went the court should have instructed the jury further in regard to fraud and submitted a further question respecting intent of the defendant and his agents. See 23 Am. Jur., Fraud and Deceit, p. 773, sec. 20.

It is possible that the court may have relied on a statement found in *Haentze v. Loehr* (1940), 233 Wis. 583, 588, 290 N. W. 163. The court said:

"It is of course not necessary in order to establish defendant's liability to show that the representations were made with intent to deceive and defraud the plaintiffs." (Citing.)

This statement was not accurate as a statement of a general principle of law which it appears to be. It is too broad.

The majority rule is stated in *International Milling Co. v. Priem* (1923), 179 Wis. 622, 624, 192 N. W. 68, as follows:

"To be actionable the false representation must consist, first, of a statement of fact which is untrue; second, that it was made with intent to defraud and for the purpose of inducing the other party to act upon it; third, that he did in fact rely on it and was induced thereby to act, to his injury or damage." (Citing cases.)

To this rule there are a number of important qualifications. The decisions are inconsistent and care should be taken to distinguish between the elements of fraud and what evidence is required to establish them. We call attention to this situation so that errors may be avoided. The right of a party to rely upon statements should also be considered. See *Kaiser v. Nummerdor* (1904), 120 Wis. 234, 97 N. W. 932, and *Standard Mfg. Co. v. Slot* (1904), 121 Wis. 14, 98 N. W. 923; *Jesse v. Tinkham* (1932), 207 Wis. 49, 239 N. W. 455.

In its instructions the court should instruct with due regard to the facts of the particular case. If right to rely is involved the instructions should deal with that subject and so with the other elements of fraud.

The first matter to be determined is whether these were questions of law or fact.

A determination as to which party was correct can only be arrived at by the application of rules of law to the undisputed facts. *Eckhardt v. Industrial Comm.* (1943), 242

Wis. 325, 7 N. W. (2d) 841. That application was for the court and not for the jury. The court undertook no solution of the problem presented. No proof was offered in the case nor were there any findings made by the jury or by the court to the effect that the statements mentioned were known by the appellant to be false or that they were made with intent to deceive or defraud. The finding of the jury in response to question 1 (a) and (b) that the statements were false is of no legal effect because they are not questions of fact but of law.

In order to determine the rights of the parties it is necessary to refer to the terms of the contract which provided that "at the end of the lease year or any extension lease year" the plaintiff was to leave as much produce on the farm as he found there. There was only one lease year and that ended October 1, 1947. No provision was made for a termination of the contract at any intermediate point. It is conceded that on October 1, 1947, the required amount of produce was on the farm; also that the stock was fed from that produce from October 1, 1947, to January 1, 1948; also that each party received his share of the proceeds of the farm down to January 1, 1948. It thus appears without dispute that plaintiff's share of the stock was fed during that period from feed belonging to the defendant. Having received the benefit of the contract during that period the plaintiff should pay his proportionate share of the total amount of feed fed between October 1, 1947, and January 1, 1948, or forty per cent. The defendant's stock had the benefit of sixty per cent of the feed fed between those dates. There is no basis on which it can be contended that the plaintiff is liable for the feed fed to the defendant's stock. January 1, 1948, was not the end of "any extension lease year" so the contract does not apply to the situation then existing. When the plaintiff pays for the amount of feed fed to his share of the stock the defendant will be fully reimbursed and have the benefit of one hundred per

cent of the produce there on October 1, 1947. We are unable to compute the amount from the record. For that reason it must be determined by the trial court or a jury.

The jury found that the defendant or his agents represented to the plaintiff that if he did not settle on January 13, 1948, he would lose all his rights under the contract. This is clearly a matter of opinion as to the legal effect of the plaintiff's failure to sign. It is not a statement of fact. Under some circumstances a legal conclusion may become the basis of misrepresentation but if so it must be made under such circumstances that the person to whom it is made has a right to rely upon it. Whether a party has a right to rely upon a false representation or whether he did rely are two distinct questions.

The circumstances were as follows: According to the testimony of the plaintiff the contention of the defendant that plaintiff would have to settle or he would lose all his rights was made during the forenoon. On his direct examination the plaintiff testified as follows:

"I signed the settlement that date under that belief; I believed and relied upon the statement of the defendant and those with him that if I didn't sign that day I would lose all my rights; that is the only reason I signed it; I signed it because they rushed me into it; they didn't give me time and I believed what they said was true."

On cross-examination he testified:

"I did not believe Mr. Nesbitt's statement. I told him I was going home to talk with my father-in-law about the whole thing before I signed but I didn't have time. I still don't believe I would be liable for the oats or the feed and I didn't when the statement was made by Mr. Nesbitt and Mr. Zobel. I was first offered $200 on the settlement, and it was finally agreed I was to be paid $600, which I received. When I cashed the check I was not satisfied I had made a complete settlement; I settled because I was rushed into it; I believed what they told me."

In addition to the fact that the statement is the expression of an opinion and not a statement of fact it is on its face so obviously untrue that the plaintiff could not have relied upon it. It appears that before he made the settlement he was not only suspicious but convinced that the statement was wrong; that he sought the advice of a lawyer and discussed the matter with his wife, and then after three hours more of negotiations finally made the proposal that he would accept the settlement if paid $600. This indicates conclusively that he did not and could not have relied upon a statement so obviously wrong. The contention of the plaintiff that he was "rushed into" signing the agreement is clearly not borne out by the facts. The parties negotiated for two hours in the forenoon, he left the conference room for two hours at noon, he returned and the negotiations were continued for three hours when he signed. That is not being rushed into a settlement. It is evident that the plaintiff signed in order to secure the benefits of the settlement which was the payment of the amount which he demanded.

Contracts of compromise and settlement are contracts of some dignity, are favored in the law, and a settlement once deliberately made is not to be opened except upon the clearest and most positive proof of fraud or mistake therein. *Case v. Fish* (1883), 58 Wis. 56, 15 N. W. 808. *Galusha v. Sherman* (1900), 105 Wis. 263, 81 N. W. 495.

It is clear that the contract of settlement cannot be impeached or set aside on the ground of fraud. Fraud is not established either with respect to the first or second cause of action.

However, there remains another matter for consideration. From the record it is clear that the settlement proceeded on a mistaken basis of the legal rights of the parties. Upon that subject there was no agreement. While there was no effort made to impeach the settlement for mistake on appeal it is considered that under all the facts and circumstances we

should exercise the power conferred upon the court by sec. 251.09, Stats., which provides:

"In any action or proceeding brought to the supreme court by appeal or writ of error, if it shall appear to that court from the record, that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the supreme court may in its discretion reverse the judgment or order appealed from, . . . and . . . direct the entry of the proper judgment or remit the case to the trial court for a new trial. . . ."

Because of the mistake it is considered that the judgment should be reversed and the cause remanded to the trial court to ascertain forty per cent of the amount of feed fed to all the stock, plaintiff's and defendant's, between October 1, 1947, and January 1, 1948, and that the account between the parties should be restated and modified accordingly.

*By the Court.*—The judgment appealed from is reversed and the cause remanded with directions as stated in the opinion.