**Lyman MORGAN and Robert Dalton, co-partners d/b/a Rite-Type Company, Plaintiffs,**

v.

**INTER-CONTINENTAL TRADING CORPORATION, a foreign corporation, Defendant.**

No. 59-C-180.

United States District Court
E. D. Wisconsin.

May 4, 1964.

Karl M. Anderson, Milwaukee, Wis., for plaintiffs.

Suel O. Arnold, Milwaukee, Wis., Hardin, Hess & Eder, New York City, for defendant.

TEHAN, Chief Judge.

In this action the plaintiffs, Lyman Morgan and Robert Dalton, residents of Wisconsin and co-partners, seek to recover damages they claim to have sustained as a result of the fraud and misrepresentation on the part of defendant, Inter-Continental Trading Corporation, through its agents, Robert Miesemer, Joseph Magisana and Gerhard Hirsch. Jurisdiction is based on diversity of citizenship.

Pursuant to stipulation and pre-trial order the issue of liability was severed from the issue of damages for purposes of trial and tried to the court. The court having heard the evidence adduced at the trial and having considered the briefs submitted on behalf of the parties, and being fully advised, is prepared to render its decision.

The following facts are undisputed:

Plaintiffs, Lyman Morgan and Robert Dalton, were salesmen by occupation and co-partners doing business as Rite-Type Company, from September, 1958 to June 20, 1959. Defendant, Inter-Continental Trading Corporation, is a foreign corporation organized under the laws of the State of Delaware with principal offices in the City and State of New York, and is now and was from May 7, 1958 to June, 1959, engaged in the importation and sale of Olympia typewriters through dealers at wholesale.

Gerhard Hirsch, during said times, was Vice-President of defendant in charge of sales, and Robert Miesemer, during said times, was his assistant.

Joseph Magisana, at said times, was the sales manager of defendant corporation in among other places, the Milwaukee area including the counties of Milwaukee, Ozaukee, Washington, Waukesha, Racine and Kenosha, pursuant to a written contract entered into with the defendant dated June 1, 1958 and amended August 1, 1959.

In September of 1958, plaintiffs and defendant executed two written non-exclusive franchise agreements by which plaintiffs agreed to buy and defendant to sell Olympia typewriters. One of said written contracts granted plaintiffs the right to purchase portable typewriters at wholesale and sell the same at retail. The other granted plaintiffs the non-exclusive right to purchase Olympia standard typewriters from defendant at wholesale and sell them at retail in Milwaukee County. These contracts were executed on behalf of the plaintiffs by L. A. Morgan in Wisconsin on September 13, 1958, and forwarded to the office of defendant for signature in New York. The contracts were signed on behalf of defendant by Gerhard Hirsch, Vice-President on September 18, 1958. The contracts were negotiated on behalf of the defendant by Joseph Magisana. Both of the contracts had provisions (1) that any modifications were to be in writing, and (2) that either party had the option to cancel the agreement upon five days written notice.

From September, 1958 to June, 1959, the plaintiffs bought typewriters from defendant at wholesale and resold them at retail until the defendant by formal written notice, dated June 15, 1959, signed by Gerhard Hirsch, terminated the written agreements and refused thereafter to sell any more typewriters to the plaintiffs.

In the original complaint, the plaintiffs alleged three causes of action, the first, grounded on breach of a distributorship contract by defendant, the second, on estoppel of defendant from denying that plaintiffs have an exclusive distributorship and the third, grounded on fraud and deceit. After issue was joined defendant moved for summary judgment relying upon the written contracts which require by their terms that any modification be in writing in conformity with the laws of the State of New York and "plaintiffs rely on alleged agreements in direct conflict with the written contracts." Thereafter, pursuant to stipula-

tion the hearing on this motion was held in abeyance to give plaintiffs an opportunity to amend their complaint. The amended complaint subsequently filed by plaintiffs sets forth a single cause of action for fraud and deceit only.

Nevertheless, at several conferences following trial of the cause and by letter to counsel, the court gave every opportunity to plaintiffs to move pursuant to Rule 15(b) of the Federal Rules of Civil Procedure, if they believed the record would support an alternative cause of action for breach of contract. Plaintiffs have failed to so move, and have elected to stand on the cause of action for fraud and deceit stated in the amended complaint.

In their amended complaint, plaintiffs make the following allegations:

"4. Commencing in the month of July, 1958, and until on or about the 20th day of February, 1959, when Mr. Gerhard Hersch as vice-president of the Trading Corporation intervened, Magisana as said district manager of the Trading Corporation in the Milwaukee area, assisted by Robert Miesemer as the assistant sales manager of the Trading Corporation for the United States, stated and represented to the plaintiffs, with the intention that they rely and act thereon, that:

"(a) Magisana was interested in finding someone in the Milwaukee area who would take on the Olympia typewriter line on an exclusive basis and promote it because Milwaukee was the biggest trouble spot in the United States.

"(b) If plaintiffs took on the Olympia line, opened a store and set up a service department they would receive an exclusive dealership, similar to the one that AAA Typewriter Company in Minneapolis and St. Paul, Minnesota, had, for the Milwaukee area consisting of the Coun-

ties of Milwaukee, Waukesha, Racine, Kenosha, Washington and Ozaukee.

"(c) Such exclusive dealership should commence upon the purchase by plaintiffs of fifty (50) Olympia typewriters from the Trading Corporation, and should continue so long as the distributorship produced reasonably satisfactory sales, in the absence of other justifiable cause for termination.

"(d) From the 13th day of September, 1958, until the purchase of said fifty (50) typewriters plaintiffs should operate under a non-exclusive franchise in written form signed by them as a matter of formality so that Olympia typewriters could be purchased by them.

"5. Said representations alleged in paragraph 4 were made by defendant and Magisana as said district manager falsely and fraudulently and with intent to defraud the plaintiffs and to induce them to take the steps and undertake the matters alleged in paragraph 7.[1]

"6. Said representations were false in fact and known to be false by said defendant and Magisana as said district manager, at the time they were so made and in truth and in fact said defendant and Magisana had no intention of giving to plaintiffs the exclusive franchise hereinbefore alleged."

The answer of the defendant (1) denies that Magisana had any authority with respect to granting or continuing dealer franchises in the Milwaukee area or anywhere else; (2) denies that defendant made the representations alleged and alleges that at the time the defendant entered into the written contracts, it did intend to grant plaintiffs an exclusive distributorship for the sale of Olympia standard typewriters for the

---

1. Paragraph 7 alleges that plaintiffs relied upon said representations and were thereby induced to sever their employment with their respective employers, rent a store and execute a two year lease there-

for and engage a serviceman, incur certain expenses in advertising and promoting the Olympia typewriter and order and pay for 331 Olympia typewriters.

Milwaukee area under and in accordance with the terms of defendant's standard form of contract for the appointment of exclusive authorized retail dealers for the sale of Olympia standard typewriters at such time thereafter as the defendant should determine that plaintiffs had to the satisfaction of defendant, demonstrated their ability and willingness in every way to act as a first class reliable distributor of Olympia typewriters. As affirmative defenses, the defendant relies on the written contracts of September, 1958 as constituting the entire agreement of the parties, which could not be modified except in writing in accordance with the New York Statute, and further avers that if any oral agreement was entered into between plaintiffs and defendant such agreement is void under Wisconsin Statutes of Frauds, § 241.02.

In the spring of 1958, Lyman Morgan, a salesman of some thirteen years' experience was employed by General Electric Company as sales representative in the Milwaukee area earning approximately $15,000 a year. His duties included the franchising and setting up of dealers for Hotpoint. Thus, he was reasonably knowledgeable in the field of dealer and distributorship arrangements.

Morgan had become interested in going into the typewriter business either by buying somone out or going into business for himself. He became interested in the Olympia typewriters through a Mr. Teeter, a partner in Teeter-Warsh Company, an old established Milwaukee firm engaged in selling office machines and equipment, including the Olympia typewriter. The two met at North Hills Country Club in May or June of 1958, and Teeter, who wanted to find a buyer for his business told Morgan about the sales possibilities of the Olympia typewriter and arranged to have Morgan meet Joseph Magisana, the sales representative for the Olympia.

Shortly thereafter Teeter introduced Morgan to Mr. Magisana at the Teeter-Warsh store in downtown Milwaukee. Morgan and Magisana repaired to a place across the street from Teeter-Warsh and talked in a general way about the Olympia "over a drink." Magisana was dissatisfied with the sale of Olympia in the Milwaukee area because the Olympia was selling all over the country except in Milwaukee, and they were having a hard time getting a good dealer to promote the typewriter in this area. The two met several other times in the early part of the summer. During one of these conversations, Magisana suggested that he was going to take Teeter "off" because he was not promoting typewriters. Morgan, who had up to this time been considering buying Teeter out, asked if $10,-000 to $20,000 would be enough capital to open a business. Magisana indicated that it would and then suggested, according to Morgan's testimony "why don't you take over the typewriter business in this area? We'll give you an exclusive in this area as soon as you open a store—buy so many typewriters and have a serviceman." There is no testimony as to the terms of the "exclusive"— whether it was to be for both portable and standards or the counties it would include. Magisana did say it would be similar to those of the Stemp Typewriter Company in Madison and the AAA Typewriter Company in Minneapolis, both of which companies had exclusives for their respective cities and the surrounding counties. In order to give Morgan an idea of the sales possibilities of the Olympia, Magisana took Morgan to Madison and introduced him to Mrs. Stemp who had built up a very successful business. Morgan made no inquiry about the exact contractual arrangements Mrs. Stemp had with defendant although it is undisputed that her "exclusive contract" was only for the sale of standard typewriters not portables,[2] and contained a cancellation provision on five days' notice. Morgan also checked on the sales of the Olympia in Baltimore, Washing-

---

2. Mr. Hirsch testified the defendant did not grant exclusive franchises for portables because they are "store and in-store" items and are not sold by salesmen contacting offices.

ton and Kansas City during his vacation in July and discovered they were selling "like mad" in those areas.

In early September of 1958, Robert Dalton, who subsequently became Morgan's partner, met Magisana for the first time in Milwaukee at Mr. Magisana's office in his home. Dalton, like Morgan, was a salesman of considerable experience. At that time he was employed by the Fredman Bag Company and had been so employed for about ten years. He was the third highest paid man in the organization earning about $14,500 a year. Magisana again expressed his dissatisfaction with the sales of typewriters in Milwaukee by Teeter-Warsh, which between portables and standards had amounted to about 72 typewriters in 1958 and wasn't enough production for them. In attempting to "sell" plaintiffs on the merits of the business, Magisana, according to Dalton, told about the fantastic job Mr. Teschion of AAA was doing in Minneapolis and St. Paul, moving about 5000 machines a year. Dalton too talked to other people about the Olympia, had the girls from his office look at the typewriter and became convinced that there wasn't a better typewriter on the market. Dalton, in his testimony, referred only in a very general way to the representations made by Magisana at this meeting. He testified "We had to purchase—before we could expect an exclusive franchise we had to purchase 50 typewriters. It was necessary that we employ a full-time service manager—and set up a service department; and it was necessary that we have a store for the purpose of selling Olympia portable typewriters."

On September 13, 1958, the plaintiffs again met with Mr. Magisana, and placed their first order for 20 typewriters—16 portables and 4 standards. Also at this time, Morgan signed on behalf of plaintiffs the non-exclusive contracts heretofore described. Both plaintiffs testified that they read the contracts and understood their contents. Thus they must be charged with the knowledge that the company had different arrangements for portables and standards; (2) that the contract for standards named only Milwaukee County as the geographical area and that either party could cancel the contract on five days written notice. Although both plaintiffs testified on this occasion that Magisana again promised that upon (1) opening a store, (2) hiring a serviceman and (3) purchasing 50 typewriters, an exclusive would be granted, but that in order to have typewriters shipped to them it was necessary to sign the non-exclusive contract as a formality, neither plaintiff asked whether the terms of the exclusive would be similar to the contract they signed, would be for both standards and portables, and cover counties outside of Milwaukee County. At this time neither plaintiff had quit his job—no store had been rented, or serviceman hired.

Shortly after the 13th of September, pursuant to Magisana's suggestion, plaintiffs made a trip to Minneapolis to visit the AAA Typewriter Company. In the absence of Mr. Teschion, they talked only to the woman managing the store. Her story of the successful record of sales in Minneapolis and the surrounding counties further fired their enthusiasm and convinced them that there was a fantastic living to be made in this business. Again, no inquiry was made about the contract which AAA had with the defendant, although the AAA contracts were exactly the same as the Stemp contract in Madison—the "exclusive" was for standards only and was terminable on five days written notice by either party. The two also took the lady manager out to dinner. It is not altogether clear what transpired at the dinner but it is undisputed that there was some suggestion that she leave the AAA Company and come to Milwaukee and work for them when they opened their store.

Mr. Morgan then returned to Milwaukee and Mr. Dalton remained in the Minneapolis area a week to finish some business for his employer. He returned to Milwaukee on a Friday and without talking it over with Mr. Morgan gave notice to his company that he was quitting ef-

fective October 15, 1958. On Saturday he saw Morgan and told him of his action, only to discover that Morgan too, had been "enthused" by the Minneapolis visit, and that he had given notice to his employer effective November 15, 1958.

Shortly thereafter the partners informed Magisana that they had quit their jobs. Dalton described Magisana's reaction as follows: "He was dumbfounded and actually seemed as if he was scared because we had quit our jobs * * *."

The plaintiffs then set about fulfilling the so-called conditions upon which they believed the grant of the "exclusive" depended. They hired a serviceman on October 1, 1958, and rented a store which was subsequently opened on November 1, 1958.

Toward the end of September, plaintiffs met, for the first time, Robert Miesemer, assistant sales manager for defendant at the Plankinton Hotel in Milwaukee and gave him a second order for typewriters. Mr. Miesemer assured them that Mr. Magisana had charge of this territory and anything he said went. The evidence fails to reveal any discussion of or demand by plaintiffs for an "exclusive" at this meeting.

On September 26, 1958, plaintiffs met Mr. Hirsch, Vice-President of Inter-Continental Sales Corporation of New York, Mr. Magisana's superior who had accepted and signed the written contracts on behalf of the defendant. The meeting took place in Chicago and was initiated by Mr. Hirsch as a result of a complaint he had received from Mr. Teschion of AAA in Minneapolis, who was very angry at what he considered plaintiffs' attempt to hire his store manager during their visit to his store. Although the plaintiffs maintained that the conversation in Minneapolis had been meant jokingly and the incident was not serious, it is apparent from the evidence, that Mr. Hirsch was much disturbed by it and entertained serious reservations about the advisability of keeping plaintiffs as Olympia dealers. Nevertheless, Mr. Hirsch welcomed the plaintiffs as dealers, said he was look-ing for a good dealer in Milwaukee and would be happy if they could do the job. He cautioned them that he considered their step in going into the office machinery business without previous experience a great risk. He offered them an exclusive in Milwaukee if they proved themselves. He told them that Mr. Magisana was in charge of the territory and that he relied heavily on his recommendations. Another order for typewriters was given at this meeting bringing the total purchased by plaintiffs to 73 typewriters (29 standards and 44 portables). No inquiry was made by the plaintiffs at this time about the details of the promised "exclusive" and no attempt made to exact a confirmation of Mr. Magisana's previous promises.

Thereafter on October 24 and 25, 1958, the plaintiffs entered the National Cost Accountant Show at the Arena in Milwaukee. This was at the suggestion of Magisana who arranged for their entry and appeared at the Arena to help them set up their booth. The partners, however, in respect to this matter, claim that Magisana defaulted in his promise to provide typewriters and sales literature and to assist them in operating their booth during the show.

Shortly thereafter, the partners began sending out advertisements and, in effect, laying out a sales promotional campaign. By November 1st, the plaintiffs had purchased more than fifty portable typewriters, hired a serviceman and rented a store which they opened on November 1st. Thus, according to their understanding, they concluded that the so-called conditions had been met and that they were entitled to an "exclusive" franchise for Milwaukee, Waukesha, Washington, Ozaukee, Racine and Kenosha Counties. More than that, they began to operate as though they were exclusive dealers. Although the written contracts of September 18, 1958 were of a non-exclusive nature and territorially limited to Milwaukee County, the plaintiffs extended their sales effort into Waukesha and Racine Counties, and later, Kenosha County.

Meanwhile, Mr. Teeter was continued as a non-exclusive dealer by Mr. Hirsch as was a Mr. Hoff of Brookfield, Wisconsin. Both Teeter and Hoff had been operating without a written agreement and on September 20, 1958, defendant signed a non-exclusive agreement with Teeter for Milwaukee County, and on October 8, 1959, signed a non-exclusive agreement with Hoff.

Mr. Hirsch explained that both Teeter and Hoff had been old customers, doing business in a minor way without any written agreements. He believed it was in the best interest of Inter-Continental to clarify the relationship and therefore he executed, on behalf of his company, formal nonexclusive franchises similar in form and provisions to the plaintiffs' franchise of September, 1958.

Thereafter, Magisana refused plaintiffs' demands to "take off" these dealers and friction and misunderstanding rapidly developed between plaintiffs and Magisana which grew from merely strained relations to open hostility and finally in January of 1959, the absolute refusal of Magisana to have anything more to do with plaintiffs. Thereupon, Mr. Hirsch himself authorized sales to the plaintiffs on a temporary basis but refused their pleas to personally service their accounts and by-pass Magisana.

Mr. Hirsch, as Vice-President in charge of sales of the Olympia, attempted at a meeting of the parties in Chicago in February of 1959 to reconcile the differences between plaintiffs and Magisana. The antagonism, however, persisted and the situation did not improve. By early June of 1959, Mr. Hirsch had concluded, after much deliberation, that it was in the best interests of his company to terminate the relationship with plaintiffs. He communicated this decision to plaintiffs by letter of June 10, 1959 in order that they might establish connections with other manufacturers at the Cincinnati Convention to be held at the end of June. This letter was followed by the formal notice of cancellation of June 15, 1959, heretofore referred to.

Nevertheless, at the Cincinnati Convention, at the instance of the plaintiffs, Mr. Hirsch again made one final attempt at reconciliation by a "quasi" arbitration conference through the good offices of one of his other salesmen. When this attempt also failed, Mr. Hirsch was confronted with a choice between Magisana or the plaintiffs. He was, as he put it, "in a most terrible dilemma." As Vice-President in charge of sales, Hirsch was supervisor of sixteen sales representatives servicing approximately fifteen hundred dealers throughout the entire United States. If he were to choose the plaintiffs it would "give a license to every dealer to go over the head of the salesmen" and he would have had a demoralized sales force. Therefore, since he was not convinced that Magisana was dishonest and because he believed it was in the best interests of his company, he stood by Magisana, and refused to reinstate the plaintiffs as dealers.

Thereafter, the defendant operated in the Milwaukee area only through non-exclusive dealers until May 22, 1962, when John Nichols, Inc., which had operated as a non-exclusive dealer since June 29, 1960, was granted an exclusive franchise for Olympia standards.

■■ Under Wisconsin law which is also the general rule, plaintiffs must establish the elements of fraud not by a mere preponderance of evidence as in the ordinary civil cases but by clear, convincing and satisfactory evidence. Institute of Commercial Art Inc. v. Maurice, 272 Wis. 499, 76 N.W.2d 332; Kamuchey v. Trzesniewski, 8 Wis.2d 94, 98 N.W.2d 403; 37 C.J.S. Fraud § 114. The elements of proof to sustain an action of fraud are (1) a false representation or promise as to a material fact; (2) such representation must be known to be false by the person making the representation; and, (3) it must be a representation upon which the promisee has a right to rely and in fact did rely and act thereon. Benz v. Zobel, 255 Wis. 542, 39 N.W. 2d 715, 13 A.L.R.2d 795; Laehn Coal & Wood Co. v. Koehler, 267 Wis. 297, 64 N.W.2d 823.

■ The alleged representations in this case are not of pre-existing facts as in the usual fraud case but are in the nature of promises subsequently unfulfilled. Wisconsin, however, follows the majority rule which is that when promises are made upon which the promisee has a right to rely and at the time of making them the promissor has a present intent not to perform, the promises may amount to fraudulent representations. See Alropa Corp. v. Flatley, 226 Wis. 561, 277 N.W. 108; Anderson v. Tri-State Home Improvement Co., 268 Wis. 455, 67 N.W.2d 853, 68 N.W.2d 705; and Suskey v. Davidoff, 2 Wis.2d 503, 87 N.W.2d 306.

■ In order to sustain their cause of action for fraud and deceit, plaintiffs bear a heavy burden. The evidence must be clear, convincing and satisfactory (1) that in September of 1958, and prior thereto, defendant, through its agents, Magisana and Hirsch, represented to plaintiffs that as soon as they had opened a store, hired a serviceman and purchased fifty typewriters, defendant would grant an exclusive franchise for the sale of Olympia typewriters in Milwaukee, Washington, Waukesha, Racine and Kenosha Counties, (2) that they had a right to rely on such representations and did so rely, and, (3) that the representations were made by defendant with a present intent not to perform and as a part of a fraudulent scheme to deceive the plaintiffs and induce them to quit their jobs and incur expenses in setting up a business.

■ It is our opinion that plaintiffs have failed to prove satisfactorily any of these necessary elements.

The most that the evidence establishes is that some type of general promise to grant plaintiffs an "exclusive", was made by Mr. Magisana and confirmed by Mr. Hirsch in the month of September, 1958. But it falls far short of a convincing showing that the promise was to grant an exclusive immediately upon the fulfillment of the three alleged conditions, and it does not establish that the promise included Racine, Kenosha, Washington, Waukesha and Ozaukee Counties. Assuming, however, that the promises were made, they were not the kind of representation on which men of ordinary caution and prudence had a right to rely. If the "exclusive" was to be similar to that of the AAA Typewriter Company in Minneapolis or the Stemp Typewriter Company in Madison, and it is so pleaded, then certainly it was incumbent upon plaintiffs to inquire into the exact terms of these contracts. Had they done so, they would have discovered that neither company had an exclusive franchise for portables, but only standards, and the contracts were terminable on five days' notice, and thus have been alerted to the fact that the parties had not reached a "meeting of the minds" concerning the contents of the promised exclusive. If the exclusive contract, as plaintiffs claim, was of such vital concern to them, without which they would never have quit their jobs or expended money opening a store and hiring a serviceman, then certainly its exact terms should have been agreed upon before they plunged headlong into the venture.

Finally, there is not even a scintilla of evidence in the record to prove that either Magisana or Hirsch in September of 1958, had a present intent not to grant plaintiffs an exclusive franchise. No conceivable advantage or gain inuring to either Magisana or Hirsch as a result of such scheme to deceive the plaintiffs has been shown. On the contrary, it was to the distinct advantage of Magisana as sales representative in this territory and Hirsch, as Vice-President in charge of the Olympia, for the plaintiffs to succeed in building up a strong dealership in Milwaukee.

Since the plaintiffs' cause of action is dependent on proof of an intent by Magisana not to perform in September of 1958 when the alleged fraudulent misrepresentations were made, evidence of events subsequent to September, 1958, is relevant only as it may bear on the intent of Magisana and Hirsch at the time the alleged September, 1958 promises were made.

The only evidence which is of any possible probative value and on which the plaintiffs place great reliance, is a tape recording entered in evidence, which was made by Mr. Dalton without Magisana's knowledge, of a telephone conversation between Morgan and Magisana on January 9, 1959, containing alleged admissions by Magisana of duplicity. A fair reading of this taped conversation as a whole discloses only that Magisana agreed with Morgan that he had promised plaintiffs an "exclusive" for Milwaukee (there is no admission as to any other counties) and that because things had changed he was going back on his word.

Plaintiffs also urge that the acts of defendant in signing a non-exclusive contract with Teeter and Hoff shortly after the alleged promises were made is evidence that Magisana and Hirsch never intended to carry out their promises. We hold that the signing of these non-exclusive contracts was primarily the responsibility of Hirsch and that contrary to the plaintiffs' version, Mr. Hirsch was prompted by the desire to disabuse those small dealers of any notion they may have had that they were "exclusive" dealers, by executing contracts in writing, spelling out that the relationship was non-exclusive and terminable on five days' notice in writing by either party. This action is also consonant with Mr. Hirsch's previous promises to plaintiffs that the grant of an "exclusive" franchise to them depended upon their proving themselves to be "first class reliable dealers." Plaintiffs also point to Magisana's failure to extend the expected help to them by not appearing at the National Cost Accountants Show in October, his infrequent visits to their store and failure to make calls to show them how to demonstrate their machines. Plaintiffs contend that the failure of defendant to call Magisana as a witness raises the inference that such evidence would be unfavorable to the defendant and would have substantiated plaintiffs' testimony. Granting plaintiffs this inference as to facts not otherwise corroborated by plaintiffs themselves, we fail to see how this is of any help to plaintiffs since their own account of Magisana's actions and representations is insufficient to establish fraud.

By plaintiffs' own admissions, Magisana suggested that they enter a display booth at the Cost Accountants' Convention in Milwaukee in October, arranged the space for them, and appeared at the Arena to look at their booth prior to the opening of the show. Also, the plaintiffs themselves testified that Magisana, before plaintiffs were committed to entering the typewriter business, accompanied Morgan to Madison to see and interview Mrs. Stemp, a successful dealer, and Mrs. Stemp in Magisana's absence extended help to plaintiffs at that Cost Accountants' Show in Milwaukee. Furthermore, by the plaintiffs own testimony, Magisana arranged for an appointment for plaintiffs with another successful dealer, Mr. Teschion of the AAA Company in Minneapolis, whose territory was similar to Milwaukee.

These are not the actions of a person set upon a course of fraud and deceit. On the contrary, we find Magisana presented forthrightly two opportunities for plaintiffs to learn at first hand, the workings of successful dealerships. By the slightest diligence they would have learned that the exclusivity covered only standard machines and that the contracts were terminable on five days written notice by either party. The proof showed that Magisana left Morgan alone with Mrs. Stemp and she was most cooperative. Yet he made no inquiry about these all important conditions. Again in Minneapolis, at the AAA Company, both plaintiffs had the same opportunity and failed to avail themselves of it.

Having found that plaintiffs have failed to prove fraud and deceit on the part of Mr. Magisana, we do not reach the issue of the liability of the defendant for the acts of its sales representative. However, the court observes that the record discloses that Magisana had no actual authority to bind the defendant and that at all times herein, plaintiffs were aware that the final decisions on

franchise and dealership agreements were made by Mr. Hirsch.

Also, because of our holding herein, it is unnecessary to go into the matter of defendant's affirmative defenses.

For the foregoing reasons we find that plaintiffs have failed to prove their cause of action. This Opinion shall stand as and for Findings of Fact and Conclusions of Law pursuant to Rule 52(b) of the Federal Rules of Civil Procedure.