Vernon C. SUMNICHT, Plaintiff-Respondent,

v.

TOYOTA MOTOR SALES, U.S.A., INC., Toyota Motor Distributors, Inc., and Toyota Motor Sales Company, Ltd., Defendants-Appellants.†

Supreme Court

*No. 83–812. Argued September 5, 1984.—Decided December 21, 1984.*

(Also reported in 360 N.W.2d 2.)

† Motion for reconsideration denied, with costs, February 5, 1985. STEINMETZ, J., dissents.

340

341

342

For the defendants-appellants there were briefs by *Robert D. Scott, Ross A. Anderson* and *Frisch, Dudek and Slattery, Ltd.,* Milwaukee, and oral argument by *Mr. Scott.*

For the plaintiff-respondent there was a brief by *Robert J. Kay, Mark C. Williamson* and *Geisler & Kay, S.C.,* Madison, and oral argument by *Robert J. Kay.*

Amicus curiae briefs were filed by *Alan E. Gesler* and *Warshafsky, Rotter, Tarnoff, Gesler & Reinhardt, S.C.,* Milwaukee, for the Wisconsin Academy of Trial Lawyers; and, *James D. Ghiardi* and *Kluwin, Dunphy & Hankin,* Milwaukee, for The Product Liability Advisory Council, Inc. and The Motor Vehicle Manufacturers' Association of the United States, *William H. Crabtree,* Detroit, Michigan, of counsel.

LOUIS J. CECI, J. This appeal is before this court on certification from the court of appeals pursuant to Sec. (Rule) 809.61, Stats.,[1] and is from a judgment

---

[1] Section 809.61, Stats., reads as follows:

"Rule (Bypass by certification of court of appeals or upon motion of supreme court). The supreme court may take jurisdiction of an appeal or other proceeding in the court of appeals upon certification by the court of appeals or upon the supreme court's own motion. The supreme court may refuse to take

and order of the circuit court for Walworth county, John J. Byrnes, circuit judge, denying appellants' motions after verdict and granting respondent's motion for judgment on the verdict against appellants in the amount of $2,350,000. We affirm the judgment and order.

Four issues are presented on appeal:

(1) Whether the jury's finding that the defective seat design was a cause of Sumnicht's injuries is supported by credible evidence.

(2) Whether the jury's finding that the defect in the design of the seat system was unreasonably dangerous is supported by credible evidence.

(3) Whether it was prejudicial error for the trial court to allow opinion testimony concerning Toyota's negligence and then, after dismissing the negligence claim, refuse to strike the opinion testimony and instruct the jury to disregard it.

(4) Whether it was prejudicial error for the trial court to instruct the jury on Toyota's duty to warn.

This case arises from an automobile accident which occurred sometime after 2:00 a.m. on May 16, 1976, when the vehicle in which Vernon C. Sumnicht was a passenger left the roadway on a curve and collided with a tree. Sumnicht was rendered a quadriplegic as a result of this accident.

The accident occurred on Highway 89, approximately five miles south of Whitewater, Wisconsin. The evidence is clear that immediately prior to the accident, Sumnicht was lying down, with his head behind the driver's seat, in the back seat of a 1975 Toyota Corolla two-door sedan operated by Edmund C. O'Connor, Jr. Sumnicht was not using the available seat belt. Jack Vallerugo was riding in the front passenger's seat of the

jurisdiction of an appeal or other proceeding certified to it by the court of appeals."

Toyota, which was equipped with bucket seats. Sumnicht, O'Connor, and Vallerugo were returning to the University of Wisconsin-Whitewater, where they were students.

The vehicle headed north on Highway 89, when it entered a large curve in the roadway. The Toyota drifted off the highway, traveling approximately 303 feet along the shoulder. It then crossed a drainage ditch and climbed a grass incline before hitting the tree head-on. At the moment of impact with the tree, the Toyota was estimated to be traveling between thirty and fifty miles per hour.

O'Connor sustained chest injuries, from which he fully recovered. Vallerugo also received chest injuries and died en route to the hospital. Sumnicht suffered a fractured dislocation of his cervical spine at C6-7, which caused his quadriplegia. Other than his severed spinal cord, Sumnicht had relatively minor injuries, which consisted of two chipped teeth, a possible fractured rib, and two leg lacerations.

Sumnicht initially commenced suit against the driver of the Toyota, his father, and their insurers,[2] later amending his complaint to include three sellers and distributors of the 1975 Toyota involved in the accident (collectively referred to herein as "Toyota").[3] The

---

[2] Prior to trial, the O'Connors received a *Pierringer*-type release from Sumnicht in exchange for $800,000, and; subsequently, the O'Connors and their insurers were dismissed from this action.

[3] Sumnicht never joined the manufacturer of the 1975 Toyota involved in this accident. The amended complaint alleged that Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Sales Company, Ltd., were engaged in the business of manufacturing, selling, and distributing Toyota automobiles and, specifically, that they manufactured the 1975 Toyota. In their answer, these Toyota defendants admitted that they manufactured Toyota automobiles but denied having manufactured the 1975 Toyota. Prior to trial, they moved to amend their answer to withdraw the

complaint alleged causes of action on the theories of strict products liability and negligence.

The trial commenced on January 31, 1983, lasting over three weeks. Sumnicht's liability case revolved around the theories that the front seat system of the Toyota was both defective and unreasonably dangerous and negligently designed and manufactured. His liability experts included an accident reconstructionist, a mechanical engineer, a biomedical engineer, a safety engineer, a neurosurgeon, and a metallurgist.

These experts testified that, at the time of the collision, Sumnicht was lying down in the back seat, with his head toward the driver's side of the Toyota. They theorized that upon impact of the car with the tree, Sumnicht was propelled forward and his head became entrapped in the cutout portion of the back of the driver's seat, while his lower torso swung forward, smashing into the back of the front passenger's seat. The inboard hinge on the passenger's seat broke loose, allowing Sumnicht's lower torso to wrap around the seat. The continued movement forward of his lower torso, while his head was stationary, created the shearing forces which injured his spinal cord and resulted in his quadriplegic condition.

Sumnicht's experts opined that the 1975 Toyota was defective and unreasonably dangerous and negligently designed and manufactured insofar as the back of the bucket seat did not have any energy-absorbing material beneath the vinyl seat cover. Instead of the bucket seat's serving as a shock absorber, it permitted Sumnicht's head to become captured in the hollow cutout portion of the back of the driver's seat.

The hinges on the passenger's seat which connect the bottom of the seat to the seat back were also criticized.

admission, and, during the course of the trial, the court did finally permit the amendment to the answer.

There was testimony that the inboard bracket on the passenger's seat broke upon impact because it was made of the weakest steel available. This allowed Sumnicht's lower torso to propel around and enter the front seat area of the Toyota. Sumnicht's experts concluded that had the seat backs not been so designed and had the bracket not broken, Sumnicht would not have sustained the paralyzing injuries.

Conversely, Toyota was of the opinion that the seat system was not defective and did not cause Sumnicht's injuries. Toyota's liability experts included an engineer specializing in crash analysis, a biomechanical engineer, an accident reconstructionist, and a metallurgist. These experts theorized that Sumnicht's head did not become entrapped in the seat at all. It was reasoned that just prior to the collision, Sumnicht sat up and was injured when he was thrown over and between the front bucket seats, striking his head on the dashboard area of the automobile.

At the verdict formulation phase of the trial, the court dismissed the negligence claim at Toyota's request, and the case went to the jury solely on the theory of strict liability. The jury found that the 1975 Toyota automobile contained such a defect in the design of the seat system as to be unreasonably dangerous to a prospective passenger in the rear seat of the automobile and found that such defective design was a cause of injuries to the plaintiff over and above those injuries which he probably would have sustained as a result of the collision without such defective design. The jury also found that O'Connor was negligent at the time of the collision and that his negligence was also a cause of plaintiff's injuries. The jury found that plaintiff was not negligent in his own conduct prior to the collision. The jury apportioned the negligence at fifty percent to the defective seat system and fifty percent to the driver, Ed-

mund C. O'Connor, Jr. The jury awarded 4.7 million dollars for the plaintiff's personal injuries, including his pain and suffering, past and future; his permanent disability; his loss of earnings, past and future; and his medical, hospital, drugs, and nursing care, past and future. These damages were awarded specifically for injuries which plaintiff sustained over and above injuries which he would have probably sustained from the collision without the defective design in the seat system. The trial court reduced the damage award by the percentage of negligence attributed to O'Connor, denied Toyota's motions after verdict, and entered judgment against Toyota in the amount of 2.35 million dollars. Toyota now appeals.

I.

A. *Introduction*

This suit falls within a class of cases commonly referred to as "second collision" or "crashworthy" cases.[4] The crashworthiness doctrine imposes liability upon a

---

[4] Although these terms are used interchangeably by most courts, one commentator suggests that there is a subtle difference between these theories of liability. He states, "Second collision cases involve an actual secondary physical impact between the injured party and a specfic part of the interior or exterior of the vehicle which, because of the design defect, increases or enhances the injuries sustained. . . .

"A 'crashworthy' case, on the other hand, . . . involves an allegation that a defect in the vehicle made it unsafe to occupy during a foreseeable collision and the plaintiff's injuries were thereby enhanced. The allegation of design defect is not directed to a specific part, contact with which causes injury, but is instead concerned with the overall protection a vehicle gives its passengers in a collision." Foland, *Enhanced Injury: Problems of Proof in "Second Collision" and "Crashworthy" Cases*, 16 Washburn L.J. 600, 606–07 (1977) (footnotes omitted).

manufacturer in a vehicular collision case for design defects which do not cause the initial accident but which cause additional or more severe injuries when the driver or passenger subsequently impacts with the defective interior or exterior of the vehicle.[5] This double-collision distinction is clarified by the following:

"An automobile collision is really two collisions. In the first phase of the accident, the plaintiff's automobile collides with another automobile or with a stationary object. Most of the property damage results from the first collision, but the occupants of the vehicle usually sustain little or no injury at this stage. Personal injuries occur most frequently in the second collision, in which the occupants are thrown against or collide with some part of their automobile. Courts will hold the manufacturer liable for the plaintiff's loss in the second collision only if defective design of the automobile caused or exacerbated the plaintiff's injury. Yet, if a court finds that defective automobile design did cause some injury, determining where one defendant's liability ends and another's begins may be virtually impossible. Both those injuries for which the manufacturer should be liable and those attributable to other causes, such as another driver's negligence, occurred during the very brief time span of the second collision." Note, *Apportionment of Damages in the "Second Collision" Case*, 63 Va. L. Rev. 475, 476 (1977) (footnotes omitted).

The instant case can be termed a "second collision" case because the respondent's claim is not that Toyota's defective seat system caused the accident ("first collision"), but, rather, that as a result of his impact with the defective seats ("second collision"), he sustained injuries which he otherwise would not have sustained.

[5] *See generally*, Ropiequet, "Current Issues Under the 'Second Collision' Doctrine," *For the Defense*, vol. 25, No. 10 at 12 (DRI Oct. 1983); and Annot., 9 A.L.R.4th 494 (1981).

The case generally credited with extending liability to manufacturers for injuries resulting from a defectively designed automobile that is uncrashworthy is *Larsen v. General Motors Corporation*, 391 F.2d 495 (8th Cir. 1968). That court pioneered the benchmark that,

"Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design *over and above* the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design." *Id.* at 503. (Emphasis added.)

This ruling is consistent with the basic premise behind all tort law which limits a defendant's liability to that portion of harm which he has in fact caused, as distinguished from harm arising from other sources.[6]

The issue of a manufacturer's liability in a "second collision" case was first decided by this court in *Arbet v. Gussarson*, 66 Wis. 2d 551, 225 N.W.2d 431 (1975), a case arising out of an automobile accident in which the plaintiffs were burned following the rupture of their vehicle's gasoline tank and ignition of the fuel. The plaintiffs alleged in their complaint that the defectively designed gasoline tank, although not a cause of the accident, was the proximate cause of their burns. The trial court dismissed the complaint, and we reversed, holding that the automobile manufacturer may incur liability for injuries to occupants of a vehicle arising from its negligence in designing the vehicle such that it is unreasonably unsafe in an accident. *Id.* at 553.

Relying on *Schnabl v. Ford Motor Co.*, 54 Wis. 2d 345, 195 N.W.2d 602, 198 N.W.2d 161 (1972), we

---

[6] *Prosser and Keeton on The Law of Torts* sec. 41 (W. Page Keeton 5th ed. 1984). *Accord, Foley v. City of West Allis*, 113 Wis.2d 475, 489, 335 N.W.2d 824 (1983).

stressed in *Arbet* that it was not important that the defect did not actually cause the initial accident, as long as it was a substantial factor in causing the injury. *Arbet*, 66 Wis. 2d at 557. We quoted with approval from *Schnabl*,

" '. . . Appellant is not suing for total injuries, but for the death alleged to have been caused by the incremental injury which occurred because of the faulty seat belt.

" 'This court has held that "The test of cause in Wisconsin is whether the defendant's negligence was a substantial factor in contributing to the result." It need not be the sole factor, the primary factor, only "a substantial factor." Whether the delivery in Wisconsin of a faulty seat belt could have been a substantial factor in causing the death of deceased, even if it played no part in the accident, is a question of fact to be determined by the trier of fact.' " *Arbet*, 66 Wis. 2d at 557–58, quoting from *Schnabl*, 54 Wis. 2d at 353–54.

*Arbet* was before this court on the pleadings, and, therefore, the decision did not deal with the problems of proof at trial. The instant case went to the jury on the theory of strict products liability.[7] Under this doc-

[7] *Restatement (Second) of Torts* sec. 402 A (1965) was first adopted as a rule of strict liability in tort by this court in *Dippel v. Sciano*, 37 Wis. 2d 443, 459, 155 N.W.2d 55 (1967). Section 402 A provides,

"Section 402 A. Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

trine, a manufacturer may be held strictly liable for harm *caused* by a defective product unreasonably dangerous to the user or consumer.

## B. Burden of Proof

The standard of proof issue in "second collision" products liability cases has been phrased by some as being an issue of which party bears the burden of proving the apportionment of damages.[8] Apportionment of damages should not be confused with plaintiff's burden of proving causation. One author explains,

"Once it is determined that the defendant's conduct has been a cause of some damage suffered by the plaintiff, a further question may arise as to the portion of the total damage sustained which may properly be assigned to the defendant, as distinguished from other causes. The question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more

---

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Under the rule of strict liability as adopted in *Dippel*, the plaintiff must prove the following to recover: "(1) [T]hat the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it." *Dippel*, 37 Wis. 2d at 460.

[8] *See generally*, Note, *Apportionment of Damages in the "Second Collision" Case*, 63 Va. L. Rev. 475 (1977).

causes." *Prosser and Keeton on Torts* sec. 52 at 345 (footnote omitted).[9]

The *Arbet* decision tells us that Sumnicht has a cause of action in strict liability against Toyota for all injuries which the defective seat system was a substantial factor in causing. *Arbet,* 66 Wis. 2d at 557. This premise forecloses recovery against Toyota for injuries sustained solely in the "first collision," because Toyota's defective seat system was not a proximate cause of the accident. Requiring Sumnicht to distinguish between the damages sustained in the "first collision" and the "second collision" is part and parcel of his burden of proving causation. However, only after Sumnicht has proven what injuries were caused by Toyota is the issue

[9] *Accord, Foley v. City of West Allis,* 113 Wis. 2d at 485–86, and *Restatement (Second) of Torts* sections 433 A and 433 B (1965), which read as follows:

"Section 433 A. Apportionment of Harm to Causes

"(1) Damages for harm are to be apportioned among two or more causes where

"(a) there are distinct harms, or

"(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

"(2) Damages for any other harm cannot be apportioned among two or more causes."

"Section 433 B. Burden of Proof

"(1) Except as stated in Subsections (2) and (3), the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff.

"(2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

"(3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm."

of apportionment of damages properly raised. The precise issue here is not which party bears the burden of apportioning damages in cases involving joint tortfeasors, but what quantum of evidence must a plaintiff bring forth in a "second collision" products liability case to prove that his injuries were proximately caused by the manufacturer's defect.

A divergence in opinion on this issue stems from the following language in *Larsen v. General Motors Corporation*, 391 F.2d 495:

"[T]he manufacturer should be liable for that portion of the damage or injury caused by the defective design *over and above* the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design." *Id.* at 503. (Emphasis added.) ; cited in *Arbet*, 66 Wis. 2d at 561.

Based on this language, appellants take the position that in a "second collision" case the plaintiff must not only prove that the defective product was a substantial factor in causing the injuries, but also must prove what the injuries would have been had there been no defect. Toyota asserts that its liability is nonexistent until Sumnicht shows the extent to which the injuries were enhanced by the defect.

Two opposing views on the plaintiff's standard of proof are set forth in *Huddell v. Levin*, 537 F.2d 726 (3d Cir. 1976), and *Fox v. Ford Motor Co.*, 575 F.2d 774 (10th Cir. 1978).[10] Toyota relies on *Huddell*, where-

---

[10] It has been suggested by one court that the difference between the *Huddell* and *Fox* decisions is not as extensive as it has been made out to be. "The decisions are not as irreconcilable as they may appear, however. The decisions are in agreement that the manufacturer is liable only for the enhanced injuries, and that a plaintiff must prove some causation between the alleged defect and the enhanced injuries. Their point of departure is on the degree of proof that is required." *Caiazzo v. Volkswagenwerk A.G.*, 647 F.2d 241, 250, n. 16 (2d Cir. 1981).

in that court held that the plaintiff must prove three elements in order to recover in a crashworthy case.

"We have set forth, *supra,* the basic elements of proof in an orthodox strict liability case under New Jersey law: a *defective* product *causing* injury. The simplicity of the general formulation belies the difficulty of applying it in the infinite variety of cases that arise. Unlike orthodox products liability or negligence litigation, crashworthy or second collision cases impugning the design of an automobile require a highly refined and almost invariably difficult presentation of proof in three aspects. First, in establishing that the design in question was defective, the plaintiff must offer proof of an alternative, safer design, practicable under the circumstances. . . . Second, the plaintiff must offer proof of what injuries, if any, would have resulted had the alternative, safer design been used. . . . We agree in this regard with Judge Barlow in *Yetter v. Rajeski,* 364 F. Supp. 105, 109 (D.N.J. 1973) that 'it is absolutely necessary that the jury be presented with some evidence as to the extent of injuries, if any, which would have been suffered . . . had the plaintiff's hypothetical design been installed. . . .' Third, as a corollary to the second aspect of proof, the plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the defective design." *Id.* at 737–38. (Emphasis in original.)

The *Huddell* court has been criticized for requiring the plaintiff to assume an impossible burden of proving a negative fact.[11] The United States Court of Appeals for the Eighth Circuit[12] declares,

"The primary difficulty we have with [the *Huddell*] analysis is that it forces not only the parties but the jury as well to try a hypothetical case. Liability and damage questions are difficult enough within orthodox principles of tort law without extending consideration

---

[11] 63 Va. L. Rev. at 491.

[12] The eighth circuit also authored *Larsen,* the seminal case for the "second collision" doctrine.

to a case of a hypothetical victim. More realistically, the parties and juries should direct their attentions to what actually happened rather than what might have happened.

". . . We write to reaffirm that *Larsen* was not intended to create a rule which requires the plaintiff to assume an impossible burden of proving a negative fact. A rule of law which requires a plaintiff to prove what portion of indivisible harm was caused by each party and what might have happened in lieu of what did happen requires obvious speculation and proof of the impossible. This approach converts the common law rules governing principles of legal causation into a morass of confusion and uncertainty." *Mitchell v. Volkswagenwerk, AG,* 669 F.2d 1199, 1204–05 (8th Cir. 1982).

Sumnicht relies on a second approach to the standard of proof in a "second collision" case, enumerated in *Fox,* 575 F.2d 774, which places a significantly lesser burden of proof on a plaintiff. In *Fox,* the tenth circuit found no reason to require plaintiffs in second collision cases to bring forth proof in addition to that required of plaintiffs in all tort cases, i.e., that the plaintiff suffered a legally cognizable injury proximately caused by the defendant. The court reasoned,

"Generally this duty to prove so-called enhanced damages is simply a part of the plaintiff's responsibility to prove proximate cause, that is, that the defendant in such a case is liable only for those damages which are within the orbit of risk created by him, but Ford would have us say that the plaintiffs were required to prove with specificity the injuries which flowed specifically from its deficiencies.

"The case which is relied on by Ford to illustrate its position is *Huddell v. Levin,* 537 F.2d 726 (3d Cir. 1976). There the holding was that plaintiff in a collision case such as the present one had the burden of proving enhanced injuries and that the presentation of evidence that the accident was survivable did not meet this burden. The thesis of this case was that collision cases are to be treated differently from other liability or

negligence cases as far as the specificity of proof is concerned. It refused to follow the orthodox doctrines of joint liability of concurrent tort-feasors for injuries which flow from their concurring in one impact.

"We fail to see any difference between this type of case and the other case in which two parties, one passive, the other active, cooperate in the production of an injury. Each one's contribution in a causal sense must be established. Damages may be apportioned between the two causes if there are distinct harms or a reasonable basis for determining the causes of injury. Restatement of Torts, Second, sec. 433 A." *Id.* at 787.

The tenth circuit then addressed the issue of apportionment of damages, holding that death "is not a divisible injury in which apportionment is either appropriate or possible." *Id.*

For the reasons set out in *Mitchell* and *Fox*, this court also rejects the two requirements enumerated in *Huddell* that the plaintiff in a "second collision" case must offer proof of what injuries, if any, would have resulted had an alternative, safer design been used and that the plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the defective design.

The *Huddell* approach is contrary to Wisconsin's strict products liability law.[13] The law of this state has never required a plaintiff to prove the negative fact of what the injuries would have been had there been no defect. This court does not intend to change the law at this time. Second, the elements that must be proven in a strict liability case are clearly established in this state, and we will not create new rules tailored uniquely for second collision cases. The rule of strict liability, as adopted in Wisconsin, requires proof that the product was in a defective condition, unreasonably dangerous, which caused the plaintiff's harm. The long-standing

---

[13] *See*, n. 7 above.

test for cause in Wisconsin is whether the defect was a substantial factor in producing the injury. *Howes v. Deer & Company,* 71 Wis. 2d 268, 273, 238 N.W.2d 76 (1976). We have held,

"It need not be the sole factor or the primary factor, only a 'substantial factor.' *Schnabl v. Ford Motor Co.,* 54 Wis. 2d 345, 353, 354, 195 N.W.2d 602, 198 N.W.2d 161 (1972). The phrase 'substantial factor' denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense. *Pieper v. Neuendorf Transportation Co.,* 87 Wis. 2d 284, 289, 274 N.W.2d 674 (1979) ; *Merco Distg. Corp. v. Commercial Police Alarm Co.,* [84 Wis. 2d] at 458, 459. There may be several substantial factors contributing to the same result. *Morgan v. Pennsylvania General Ins. Co.,* 87 Wis. 2d 723, 735, 275 N.W.2d 660 (1979) ; *Sampson v. Laskin,* [66 Wis. 2d] at 325; *Blashaski v. Classified Risk Ins. Corp.,* 48 Wis. 2d 169, 174, 175, 179 N.W.2d 924 (1970)." *Clark v. Leisure Vehicles, Inc.,* 96 Wis. 2d 607, 617–18, 292 N.W.2d 630 (1980).

The requirement in *Huddell* that the plaintiff prove the extent of enhancement of injuries would, in some cases, require the plaintiff to isolate that portion of injuries caused solely by the manufacturer. This may be an impossible task and is not required by the law of this state. We affirm the applicability of the substantial factor test in proving causation.

In keeping with the law of this state, we hold that in a "second collision" products liability case, the plaintiff must prove that the defective product was a substantial factor in causing the harm from which damages are claimed. The degree to which the plaintiff will be required to distinguish between the injuries sustained in the "first collision" and those sustained in the "sec-

ond collision" will be governed by his burden of proving causation via the substantial factor test. This requirement is necessarily dependent upon the particular facts of the case. For instance, Toyota's defective seat system did not cause the accident in this case, and, therefore, Toyota is not liable for injuries caused solely from the "first collision." However, we recognize that a plaintiff will not have to distinguish between injuries in every case because not all "second collision" cases involve multiple injuries capable of division.

In any event, once the plaintiff has proven that the defect was a cause of his injuries, he need not prove what portion of indivisible harm is attributable solely to the manufacturer. If there is more than one tortfeasor who contributed to the injury, Wisconsin's law concerning joint and several liability applies.

" 'When two actors negligently conduct themselves so as to injure another, they become jointly and severally liable to the other if their actions concur in time to directly produce injury or to create an injury-producing situation. *See: Butzow v. Wausau Memorial Hospital* (1971), 51 Wis. 2d 281, 288, 289, 187 N.W.2d 349. *Johnson v. Heintz*, 73 Wis. 2d 286, 302, 243 N.W.2d 815 (1976).' " *Wis. Natural Gas v. Ford, Bacon & Davis Constr.*, 96 Wis. 2d 314, 331, 291 N.W.2d 825 (1980).[14]

---

[14] This case is similar to the fact situation in *Butzow* and *Heintz*, both of which involved successive tortfeasors. In *Butzow*, we held that the original tortfeasor was liable not only for the damages proximately caused by his negligence, but also for the aggravation of damages caused by the negligence of a physician. The original tortfeasor and the physician were jointly and severally liable only for the aggravation of damages. The physician was not liable for the damage caused solely by the negligence of the original tortfeasor.

The same result was reached by this court in *Heintz*, which involved a double collision automobile accident. The subsequent

As discussed above, only after the plaintiff establishes that there are joint tortfeasors can the issue of apportionment of damages be raised.

### C. *Sufficiency of Evidence*

In reviewing a jury's verdict, the test is whether there is any credible evidence in the record on which the jury could have based its decision. The evidence is viewed in the light most favorable to sustain the verdict; we do not look for credible evidence to sustain a verdict the jury could, but did not, reach. *D.L. v. Huebner,* 110 Wis. 2d 581, 634, 329 N.W.2d 890 (1983); sec. 805.14(1), Stats.[15]

"The credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment, and where more than one inference can be drawn from the evidence, this court must accept the inference drawn by the jury." *Roach v. Keane,* 73 Wis. 2d 524, 536, 243 N.W.2d 508 (1976), cited with approval in *Johnson v. American Family Mut. Ins. Co.,* 93 Wis. 2d 633, 644, 287 N.W.2d 729 (1980).

Question number two of the special verdict in this case asks,

---

tortfeasor was held liable only for the damages sustained in the second collision. Likewise, in this case Toyota is not liable for injuries sustained in the "first collision," because the defect did not cause the accident. Toyota is liable for injuries sustained in the "second collision" if the defect was a substantial factor in causing those injuries.

[15] Section 805.14(1), Stats., provides as follows: "**805.14 Motions challenging sufficiency of evidence; motions after verdict.** (1) TEST OF SUFFICIENCY OF EVIDENCE. No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party."

"Was such defective design a cause of injuries to the plaintiff over and above those injuries which he probably would have sustained as a result of the collision without such defective design?"

The "over and above" language of this, verdict question was specifically objected to by Sumnicht at trial. He argued that there was no basis in Wisconsin's law for this language and that the question should simply ask whether the operative defect was a substantial factor in causing the injury. We agree and specifically reject the use of the "over and above" language contained in the causation question. The correct test of causation is whether Toyota's defective seat system was a "substantial factor" in producing Sumnicht's quadriplegia.

Given the erroneous verdict question, we must decide whether a new trial must be granted. A new trial is not warranted if,

". . . the special verdict questions and instructions adequately conveyed the necessary information to the jury and the jury made the necessary findings to allow the circuit court to calculate plaintiffs' recovery." *Foley,* 113 Wis. 2d at 494.

We hold that the instructions and the verdict were adequate under the circumstances. The jury was given the standard jury instruction for cause[16] and instructed

---

[16] Wis. J I—Civil 1500 (1977), which provides as follows:

"The cause questions inquire as to whether or not there was a causal connection between the negligence of any person, as found by you, and the (collision) (accident) (injury) (accident and injury). Notice that these questions do not ask about 'the cause', but rather 'a cause.' The reason for this is that there may be more than one cause of a (collision) (accident) (injury). The negligence of one person may cause a (collision) (accident) (injury) or the combined negligence of two or more persons may cause it. Before you can find that (any) (a) person's negligence

that the defect or the negligence of the defendants need not actually cause the initial accident, as long as the defect or such negligence was a substantial factor in causing the injury to the plaintiff. Subsequently, the jury returned an affirmative answer to the cause question. It is reasonable to conclude, based on the positions of the parties and the evidence adduced at trial, that the jury considered the injuries "over and above" those injuries which probably would have been sustained as a result of the collision without such defective design to be Sumnicht's quadriplegia. The issue now is whether there is credible evidence to support a finding that Toyota's defective seat system was a substantial factor in causing Sumnicht's quadriplegia. We conclude that there is.

Toyota first contends that Sumnicht's injuries were not caused by the defective seat system because Sumnicht did not receive his injuries by his head becoming entrapped in the driver's seat while his legs wrapped around the passenger's seat, but by flying between the bucket seats and hitting his head on the dashboard of the Toyota. Alternatively, Toyota avers that even if the defective seat system did contribute to Sumnicht's injuries, the respondent's proof was insufficient to sustain an affirmative answer to question number two of the verdict, because Sumnicht's experts did not render testimony with respect to the extent to which Sumnicht's injuries were enhanced by the defective seat system.

was a cause of the (collision) (accident) (injury), you must find that his negligence was a substantial factor, that is, that it had a substantial influence, in producing the (collision) (accident) (injury). In other words, there must be such a real, causal connection between the negligence and the (collision) (accident) (injury) that the negligence under consideration was a factor actually operating which had a substantial effect in producing the (collision) (accident) (injury)." (Emphasis in original.)

Toyota believes that the jury was properly instructed concerning the proof of injuries required in a "second collision" case,[17] but argues that the trial court erred in evaluating the sufficiency of the plaintiff's proof.

Sumnicht first asserts that his injuries were caused by Toyota's defective seat system, which allowed his head to become entrapped in the hollow cutout portion of the back of the driver's seat and his legs to propel around the passenger's seat. Second, he believes that he was not required to bring forth evidence of enhancement of injuries because it is not his theory that Toyota's defective seat system enhanced his injuries to where his cervical spine was fractured, but, rather, that the defect proximately caused his entire injury.

[17] The jury was instructed in part as follows: "This is a crashworthiness case. The plaintiff does not claim that the Toyota defendants in any way caused the collision to occur. The plaintiff does claim that one or more defects in the design of the front seat system caused him to sustain injuries which he would not have otherwise sustained in the accident.

"Question No. 2 and 8 of the verdict refer to such injuries, and they are sometimes called 'enhanced injuries.' If you find that the Toyota seat system was defective, the term 'enhanced injuries' applies to the portion of Mr. Sumnicht's injuries over and above any injuries that he probably would have received as a result of the collision with the tree if the seat system had not been defective.

"If you find that the Toyota defendants are liable to the plaintiff, their liability is limited only to those damages that will fairly compensate the plaintiff for any additional injuries caused by the defective seat system. In other words, if the seats were not defective, the Toyota defendants are not liable to compensate the plaintiff for any damage or injuries which occurred as a result of the collision with the tree.

"By the same token, if you find that Mr. Sumnicht would have sustained the same injuries or a similar injury or even a different but equally serious injury in the accident even if the seats had not been defective, then your answer to Question No. 2 should be 'No' because a defective seat system did not cause Mr. Sumnicht any of such enhanced injury."

Besides his severed spinal cord, the respondent suffered inconsequential injuries.

Six experts were called to testify during the course of Sumnicht's case in chief. Testimony significant to the issue of causation included that of Bruce Enz, a safety engineer and accident reconstructionist; Dr. Anthony Sances, a biomedical engineer; Dr. Patrick Walsh, a neurosurgeon; and Dr. Robert Brenner, a safety engineer.

Bruce Enz, vice president of the Institute for Safety Analysis, testified regarding the accident reconstruction and the respondent's kinematics[18] at the time of the collision. Based on his thorough examination of the Toyota, he concluded that, at the time of the impact, the respondent was lying in the back seat of the vehicle on his left side, with his head toward the driver's side. In a simultaneous progression, his upper torso struck the driver's seat, entrapping his head in the cutout portion of the driver's seat, while his legs flew forward, striking the passenger's seat. His lower torso then continued forward as a result of the failure of the seat's bracket that holds together the seat's back rest and bottom. This movement caused Sumnicht's body to rotate around his upper thorax area. Enz's examination of the Toyota eliminated other possible kinematic scenarios by which Sumnicht could have sustained his injuries. Enz concluded,

"It's my opinion that the entrapment and capturing capability of the seat backs and the failure of the bracket enhanced and created the injury mechanism."

Dr. Anthony Sances also testified concerning his analysis of Sumnicht's injury sequence. Based on his

[18] Defined as "a branch of dynamics that deals with aspects of motion (as acceleration and velocity) apart from considerations of mass and force." *Webster's Third New International Dictionary* 1243 (1967).

inspection of the Toyota and his evaluation of the medical reports, Sances attested that the upper portion of Sumnicht's spinal column became fixed as his legs swung forward. This created a shear force between the sixth and seventh cervical elements that subsequently ripped the spinal cord. He opined that Sumnicht would not have sustained his paralyzing injuries if the driver's seat had not allowed his head to become entrapped and if the seat's bracket had not failed.

Dr. Walsh testified mainly from the respondent's X-rays. He claimed that Sumnicht's paralyzing injuries were caused by a number of forces on his spine, including flexion, compression, shear, and possible rotation. More importantly, Walsh stated that these findings were consistent with the hypothesis that the respondent's head became entrapped in the back of the driver's seat while his lower torso continued to move forward.

Finally, Robert Brenner, president of the Institute for Safety Analysis, testified with respect to the design of Toyota's seat system. He initially assigned Mr. Enz with the responsibility of taking the crash vehicle apart to analyze what happened in the crash. He subsequently studied a number of documents and reports and examined the vehicle himself to analyze the crashworthiness of Toyota's seat system. He was of the opinion that the defective seat design was a substantial factor in causing Sumnicht's injuries.

We hold that there is credible evidence to support a finding that the defective seat design was a substantial factor in causing Sumnicht's injuries. Two separate theories were presented at trial as to how Sumnicht's spinal cord was severed. Toyota opined that the respondent's injuries were caused by Sumnicht's hitting his head on the dashboard of the Toyota. The jury obviously chose not to believe Toyota's theory and, instead, relied on Sumnicht's theory of causation. We

agree with the jury's determination, which is supported by expert testimony and the physical facts of this case.

██

Second, although Sumnicht was not required to prove what extent of his injury was over and above any injury which he probably would have sustained as a result of the collision without the defective design, in essence this was proven at trial. There is sufficient evidence to support Sumnicht's theory that the portion of indivisible harm attributable solely to the defective design was his fractured cervical spine. The respondent adequately distinguished between the injuries he would have sustained without the defect (his minor injuries) and those injuries caused by the defect (his fractured spine). The trial court, at motions after verdict, held that the jury did make a determination concerning enhancement of injuries. The trial court found, and we agree, that it is reasonable to say that the jury reasoned that if the seats had been properly engineered, the respondent would have sustained practically no injuries. Technically, the defective seat system did not "enhance" Sumnicht's injuries because, but for the defect, there were no injuries to enhance. The defect in this case was latent until activated by the negligence of the driver of the car; acting together, this produced Sumnicht's quadriplegia. Toyota's defective seat system did not enhance the respondent's injury; it was a substantial factor in causing it.

## II.

Sumnicht's entire liability case concentrated on the alleged design defects in Toyota's seat system.

"The fact that the defect relates to *design* rather than *negligent manufacture* makes no difference. In

*Schuh v. Fox River Tractor Co.* [63 Wis. 2d 728, 218 N.W.2d 279 (1974)] this court held that a manufacturer could be liable under a strict products liability theory where it had designed a machine such that it was unreasonably dangerous." *Arbet,* 66 Wis. 2d at 556. (Emphasis in original.)

The rule of strict liability in Wisconsin requires proof that the product was in a defective condition when it left the possession or control of the seller and that it was unreasonably dangerous to the user or consumer.[19] Determining whether a product is defective and whether a product is unreasonably dangerous are two separate inquiries.

Two separate approaches have emerged to evaluate design defects—a consumer-contemplation test and a danger-utility test. These approaches have been distinguished as follows:

"Under the consumer-contemplation test, as so stated in Section 402A of the Second Restatement of Torts, a product is defectively dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it with the ordinary knowledge common to the community as to the product's characteristics.

". . . Under [the danger-utility test] approach, a product is defective as designed if, but only if, the magnitude of the danger outweighs the utility of the product. The theory underlying this approach is that virtually all products have both risks and benefits and that there is no way to go about evaluating design hazards intelligently without weighing danger against utility. There have been somewhat different ways of articulating this ultimate standard or test. But in essence, the danger-utility test directs attention of attorneys, trial judges, and juries to the necessity for weighing the danger-in-fact of a particular feature of a prod-

---

[19] *See,* n. 7 above.

uct against its utility." *Prosser and Keeton on Torts,* sec. 99 at 698–99 (footnotes omitted).

Wisconsin is committed to the consumer-contemplation test for determining whether a product is defective.[20] In *Vincer v. Esther Wms. All-Alum. S. Pool Co.,* 69 Wis. 2d 326, 230 N.W.2d 794 (1975), this court adopted comment g to the *Restatement (Second) of Torts* sec. 402 A at 351, which defines "defective condition" in part as follows:

" 'g. *Defective condition.* The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.' " *Vincer,* 69 Wis. 2d at 330.

Conversely, comment h to sec. 402 A of the Restatement defines when a product is not defective.

"h. A product is not in a defective condition when it is safe for normal handling and consumption." *Restatement (Second) of Torts* sec. 402 A, comment h at 351.

Although these comments serve as a guideline, the term "defect" is not susceptible to any general definition, and a decision on whether a defect exists must be made on a case-by-case basis. *Keller v. Welles Dept. Store of Racine,* 88 Wis. 2d 24, 32, 276 N.W.2d 319 (Ct. App. 1979); *Ransome v. Wisconsin Electric Power Co.,* 87 Wis. 2d 605, 621, 275 N.W.2d 641 (1979); and *Jagmin v. Simonds Abrasive Co.,* 61 Wis. 2d 60, 66, 211 N.W.2d 810 (1973).

The second element that must be proven is that the product is "unreasonably dangerous." Comment i to

---

[20] *See, e.g., Priske v. General Motors Corp.,* 89 Wis. 2d 642, 279 N.W.2d 227 (1979), and *Kozlowski v. John E. Smith's Sons Co.,* 87 Wis. 2d 882, 275 N.W.2d 915 (1979).

sec. 402 A of the *Restatement (Second) of Torts,* at 352, defines "unreasonably dangerous" in part as follows:

"i. *Unreasonably dangerous.* The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by 'unreasonably dangerous' in this Section. *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."* (Emphasis added.); cited with approval in *Vincer,* 69 Wis. 2d at 331. The emphasized language was cited with approval in *Netzel v. State Sand & Gravel Co.,* 51 Wis. 2d 1, 11, 186 N.W.2d 258 (1971), and *Arbet,* 66 Wis. 2d at 557.

In *Arbet,* this court commented that for a defective design condition to be unreasonably dangerous, it must be found to be hidden and not an obvious defect.

"It must be noted also that the design characteristics complained of in the instant case were hidden dangers, not apparent to the buyer of the car, and not the subject of a manufacturer's warning. This is a different case, therefore, than a case where a plaintiff sues the manufacturer of a Volkswagen and complains that the car was designed too small to be safe. Such a defect could hardly be said to be hidden. . . . [S]ince the ordinary consumer would expect a Volkswagen to be less safe in an accident than, say, a Cadillac, the smallness of the car with the attendant danger would not per se render it inherently dangerous. Rather it must contain a dangerous defect whose presence an ordinary consumer would not reasonably expect." *Id.*

The applicable test in Wisconsin is summarized as follows:

"Thus, the test in Wisconsin of whether a product contains an unreasonably dangerous defect depends upon the reasonable expectations of the ordinary consumer concerning the characteristics of this type of product. If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, it would not be unreasonably dangerous and defective. This is an objective test and is not dependent upon the knowledge of the particular injured consumer, although his knowledge may be evidence of contributory negligence under the circumstances." *Vincer*, 69 Wis. 2d at 332 (footnote omitted).

Question number one of the special verdict asks,

"Did the 1975 Toyota automobile contain such a defect in the design of the seat system as to be unreasonably dangerous to a prospective passenger in the rear seat of the automobile?"

We must now decide whether the jury's affirmative answer to this question is supported by credible evidence. We hold that it is.

Toyota contends that there is no credible evidence to support the jury's finding that the defect in the design of the seat system was unreasonably dangerous because the respondent brought forth no proof of "an alternative, safer design, practicable under the circumstances." *Huddell*, 537 F.2d at 737. We disagree with Toyota for two reasons. First, although evidence of an alternative safer design may be relevant and admissible[21] in a prod-

---

[21] Section 904.01, Stats., provides as follows: "**Definition of** 'relevant evidence.' 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Section 904.02, Stats., provides as follows: "**Relevant evidence generally admissible; irrelevant evidence inadmissible.** All rele-

ucts liability case, our state's strict products liability rule does not mandate such evidence.[22] A product may be defective and unreasonably dangerous even though there are no alternative, safer designs available. *See, D.L. v. Huebner,* 110 Wis. 2d at 619, where we held that a whole industry may be negligent in failing to adopt new and available devices. The question is not whether any other manufacturer has produced a safer design, but whether the specific product in question is defective and unreasonably dangerous. Second, although not required, the evidence in this case proves that there was an alternative safer design available for Toyota's seat system. There was a confirmation by one witness that there are numerous energy-absorbing materials available to fill in the cutout section of the driver's seat and that these materials were being used in the industry. Also, another witness stated that the bracket on the passenger's seat failed because it was made of low-grade steel instead of a material that would stand up to forces in a reasonably foreseeable collision.

This court has refrained from adopting mandatory factors that must be weighed when determining if a product is defective and unreasonably dangerous. Since product defects are unique in each case, the factors that

vant evidence is admissible, except as otherwise provided by the constitutions of the United States and the state of Wisconsin, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible."

[22] *See, e.g., Greiten v. La Dow,* 70 Wis. 2d 589, 597, 235 N.W.2d 677 (1975), where the trial court considered theoretical alternatives to the design of a printing press that were suggested by plaintiff's expert witness. The trial court granted defendant's motion for a directed verdict, finding that the plaintiff failed to establish a defectively designed product that was unreasonably dangerous. This court affirmed the trial court's dismissal of the action.

will be beneficial in assessing defectiveness and unreasonableness will differ from case to case. The United States Court of Appeals for the Seventh Circuit, in applying Wisconsin law, has suggested five factors which should be examined when determining the reasonableness of a design. This list may be beneficial to plaintiffs in proving their case, but these factors are clearly permissive. The relevant factors are:

"1) [C]onformity of defendant's design to the practices of other manufacturers in its industry at the time of manufacture; 2) the open and obvious nature of the alleged danger; . . . 3) the extent of the claimant's use of the very product alleged to have caused the injury and the period of time involved in such use by the claimant and others prior to the injury without any harmful incident. . . . 4) the ability of the manufacturer to eliminate danger without impairing the product's usefulness or making it unduly expensive; and 5) the relative likelihood of injury resulting from the product's present design." *Collins v. Ridge Tool Company*, 520 F.2d 591, 594 (7th Cir. 1975).

The existence of a product's defective design that is unreasonably dangerous can be established through expert opinion testimony that was formed after an examination of the product. *Barris v. Bob's Drag Chutes & Equipment*, 685 F.2d 94, 101 (3d Cir. 1982). Four of the respondent's experts—Enz, Sances, Brenner, and Weiss —gave their opinions with respect to the defectiveness and unreasonableness of Toyota's seat design.

Enz examined the Toyota and stated that the seat system was defective and unreasonably dangerous, specifically, the open cutout section of the driver's seat, which has the capability of capturing and entrapping, and the inadequate metal selected for the bracket, which allowed it to break upon impact. Dr. Sances also testified that the seat design was defective and unreason-

ably dangerous and that many energy-absorbing materials were available to cover the cutout portion of the driver's seat. Dr. Brenner, an automobile safety engineer with substantial credentials,[23] testified at great length as to how a properly designed seat system would compartmentalize an unbelted rear seat occupant and manage the energy caused in a foreseeable collision. It was his opinion that the seat system failed and was, therefore, defective and unreasonably dangerous because of the hollow cutout portion in the driver's seat, the lack of energy-absorbing material in the cutout section, and the weak steel from which the bracket was made. Finally, Stanley Weiss, a metallurgist, testified with respect to the seat bracket that had failed. He stated that he performed a fractographic analysis (to determine the nature of the fracture), a stress analysis, and a hardness test on the bracket. He concluded that the seat bracket was defective because it was made of the weakest steel available and would not withstand the force of a rear seat occupant's impacting it in a reasonably foreseeable crash.

In addition to expert testimony, the presence of a product's defective design that is unreasonably dangerous can be established by the presentation of circumstantial evidence. *Barris*, 685 F.2d at 101. "Evidence of a malfunction is one type of circumstantial evidence that can be used in establishing a defective condition." *Id.* In this case, it was undisputed that there was severe damage to the interior of the Toyota: the bracket on the passenger's seat broke, the seats were displaced, the floor buckled, and the vinyl covering the back of the driver's seat showed an imprint from a body. Second, there was testimony that from a safety standpoint,

---

[23] *See, Seese v. Volkswagenwerk A. G.*, 648 F.2d 833, 844 (3d Cir. 1981).

a primary function of a seat system is to compartmental-
ize unbelted rear seat occupants and not to enhance
injuries that may occur in a reasonably foreseeable colli-
sion. The respondent brought forth evidence that Toy-
ota's seat system did not serve the function of com-
partmentalizing unbelted rear seat occupants. Also, al-
though controverted by other evidence, the respondent
introduced an article co-authored by Arnold Siegel,
Toyota's chief expert, which included a study of 54
frontal collisions resulting in 135 incidents of injuries
to unbelted rear seat occupants. Only twenty percent
of the rear seat passengers suffered serious injuries
in crashes occurring at speeds over forty miles per
hour; eighty percent of those injured suffered only mod-
erate or minor injuries. Sumnicht inferred that absent
the defective seat system, it was probable that he would
have suffered only moderate or minor injuries, but in
this case the Toyota was defective in that it failed to
protect him from further injuries.

Finally, Toyota showed two films of full-scale crash
tests conducted on 1975 Toyota Corollas. The results of
these tests were challenged by the respondent. Testi-
mony was adduced that the seat brackets in the film
broke upon impact, just as the bracket did in this case,
and that the films supported the respondent's theory
of liability and not Toyota's theory.

Before we get to the issue at hand, we must first
note that the risk that a car may be in an accident is
reasonably foreseeable by the appellants, and, therefore,
the appellants have a duty to anticipate that risk. *Arbet*,
66 Wis. 2d at 558. We reemphasize the following from
the *Larsen* decision:

"We perceive of no sound reason, either in logic or
experience, nor any command in precedent, why the manu-
facturer should not be held to a reasonable duty of

care in the design of its vehicle consonant with the state of the art to minimize the effect of accidents. The manufacturers are not insurers but should be held to a standard of reasonable care in design to provide a reasonably safe vehicle in which to travel. . . . The duty of reasonable care in design should be viewed in light of the risk. While all risks cannot be eliminated nor can a crash-proof vehicle be designed under the present state of the art, there are many common-sense factors in design, which are or should be well known to the manufacturer that will minimize or lessen the injurious effects of a collision. The standard of reasonable care is applied in many other negligence situations and should be applied here." *Larsen,* 391 F.2d at 503, cited with approval in *Arbet,* 66 Wis. 2d at 560.

In viewing the evidence in the light most favorable to the respondent, we hold that there is credible evidence to sustain the jury's finding that Toyota's seat system was both defective and unreasonably dangerous. It was reasonable for the jury to conclude that Toyota's seat system was defective in that it failed to compartmentalize the respondent in a foreseeable frontal collision and, thus, failed to minimize his injuries, and that the defect was unreasonably dangerous because rear seat occupants would not realize the risk of harm that they are subjected to if an accident does occur. The defect in the design of the seat system was not open and obvious to an ordinary passenger. It is rational to hold that Toyota's seat system was not as safe as it reasonably could have been or as safe as reasonably contemplated by rear seat occupants.

### III.

As previously stated, Sumnicht's theories of liability included both strict products liability and negligence. Testimony was allowed, over the appellants' objections,

that Toyota's front seat system was negligently designed and manufactured. Toyota objected to this testimony, contending that they did not design or manufacture the automobile, but merely distributed it. They assert that since "the heart of a negligence action is the actor's conduct," any negligence claim requires proof that the defendant actually participated in the activity at issue. *D.L. v. Huebner*, 110 Wis. 2d at 610. Therefore, it is argued, the respondent's negligence claim was inappropriate because the appellants never participated in the alleged negligent design and manufacture of the Toyota.

We hold that the testimony regarding the negligence claim was initially admissible because, at the time it was elicited, Toyota was on the record as having admitted that they were in the business of manufacturing Toyota automobiles.[24] The issue becomes whether the trial court should have stricken this evidence from the record and instructed the jury to disregard it once the negligence claim was dismissed.

Section 901.03 (1), Stats., provides,

"EFFECT OF ERRONEOUS RULING. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantive right of the party is affected. . . ."

This is consistent with the oft-stated "harmless error" rule. Error in admitting testimony is harmless unless it appears to have been prejudicial to the party complaining. *Chippewa Falls Hotel Co. v. Employers L.A. Corp.*, 208 Wis. 86, 89, 241 N.W. 380 (1932).[25]

Toyota believes that they were prejudiced by the admission of this negligence evidence in that: (a) both the trial judge and the respondent's counsel believed that proof of negligence in the design/manufacture of

[24] *See*, n. 3 above.
[25] *Accord, Wold v. State*, 57 Wis. 2d 344, 356, 204 N.W.2d 482 (1973).

the seat system was probative of Toyota's responsibility under strict liability, and (b) both the trial judge and the respondent's counsel conveyed this belief to the jury.

No question on the negligence count was presented to the jury on the special verdict, and, thus, the jury was foreclosed from considering the negligence evidence in that respect. The only possibility of prejudice to the appellants by the trial court's refusal to strike the negligence testimony would have been if the jury had utilized the negligence evidence to determine that the defect in the design of the seat system was unreasonably dangerous.

Even assuming that it was erroneous for the court to refuse to strike the testimony, we have previously held that in determining the necessity for a new trial due to the admission of prejudicial evidence, the effect of the inadmissible evidence should be weighed against the totality of the sufficient credible evidence supporting the verdict. *Strelecki v. Firemans Ins. Co. of Newark*, 88 Wis. 2d 464, 481, 276 N.W.2d 794 (1979), citing *In re Estate of Glass*, 85 Wis. 2d 126, 147, 270 N.W.2d 386 (1978).

We hold that the appellants' argument is without merit. We have already determined in the two preceding sections of this opinion that the verdict is supported by sufficient credible evidence. The trial court's refusal to strike the negligence testimony had little or no effect on the jury's determination.

## IV.

The fourth and final issue on appeal is whether it was prejudicial error for the trial court to instruct the jury on Toyota's duty to warn. At the hearing on motions after verdict, the trial court held that Toyota had not been prejudiced by the giving of the duty to

warn instruction. Toyota contends that the warning instructions were erroneous and prejudicial because Sumnicht failed to establish any causal connection between a warning or a lack of warning and the plaintiff's injuries and because the court gave a warning instruction incorporating a negligence duty, even though the negligence claims were dismissed at the close of the evidence. We hold that this argument is also without merit.

The duty of a court to instruct the jury was discussed in *Lutz v. Shelby Mut. Ins. Co.*, 70 Wis. 2d 743, 235 N.W.2d 426 (1975), wherein we stated,

"As a general rule, of course, a trial court should instruct the jury with due regard to the facts of the case. *Benz v. Zobel* (1949), 255 Wis. 542, 39 N.W.2d 713. It is error for a court either to refuse to instruct on an issue which is raised by the evidence or to give an instruction on an issue which finds no support in the evidence. Where the court has erroneously given or refused to give an instruction, however, a new trial is not warranted unless the error is determined to be prejudicial. The test to be applied in determining whether such an error is prejudicial is the probability and not mere possibility that the jury was misled thereby. Stated another way, an error relating to the giving or refusing to give an instruction is not prejudicial if it appears that the result would not be different had the error not occurred." *Lutz,* 70 Wis. 2d at 750–51 (footnotes omitted).[26]

We need not reach the issue of whether it was error for the trial court to instruct the jury on Toyota's duty to warn, because we find such instruction was not prejudicial to Toyota.

The applicable test to determine whether Toyota was prejudiced is whether the outcome of the verdict would have been different had the trial court not given the instruction. The jury was never asked a verdict question

---

[26] *Accord, D.L. v. Huebner,* 110 Wis. 2d at 628.

on Toyota's negligence in failing to give a warning, and, therefore, the jury did not consider the instruction in that respect. Second, it is possible that Toyota's failure to warn did enter into the jury's deliberations concerning the defectiveness of Toyota's seat system. Even so, there is sufficient credible evidence to support the verdict. This evidence was thoroughly reviewed in section II of this opinion.

We hold that it is not probable that the jury was misled by this instruction or that the verdict would have been different had the alleged error not occurred. Accordingly, a new trial is not warranted.

*By the Court.*—The judgment and order of the circuit court are affirmed.

HEFFERNAN, CHIEF JUSTICE (concurring). The parties in this case have raised and argued two separate issues: first, what is the standard of proof of causation in a products liability case based on the claim of a design defect; and, second, which party has the burden of proof of apportioning damages between injuries sustained as a result of the automobile accident itself and the additional injuries sustained as a result of the defective design.

The majority holding correctly states the law in Wisconsin that a plaintiff must prove that the defect was a substantial factor in producing the injury. P. 358, *supra*. *See Arbet v. Gussarson,* 66 Wis. 2d 551, 557–58, 225 N.W.2d 431 (1975). In the present case, the jury found, based on substantial evidence, that the defective design of the seats in the Toyota was a substantial factor in producing Sumnicht's quadriplegia.

By virtue of the wording of the special verdict in this case,[1] it is clear that the jury concluded that all of

---

[1] Special verdict question two asked:

"Was such defective design a cause of injuries to the plaintiff over and above those injuries which he probably would have sustained as a result of the collision without such defective design?"

damages sustained were caused by the defective seat system. As the majority states:

"The trial court found, and we agree, that it is reasonable to say that the jury reasoned that if the seats had been properly engineered, the respondent would have sustained practically no injuries. Technically, the defective seat system did not 'enhance' Sumnicht's injuries because, but for the defect, there were no injuries to enhance." P. 366, *supra.*

Consequently, there are no distinct harms or damages to apportion in this case. This court, therefore, need not address the issue of the burden of proof of apportioning damages in "second collision" cases.[2]

I write separately to state that, because the facts of this case do not present the issue of the apportionment of damages, the majority opinion's discussion of the *Huddell*[3] standard of proof of enhanced injuries and of Wisconsin law on the apportionment of damages constitutes dicta unnecessary to the holding.

I am authorized to state that JUSTICES SHIRLEY S. ABRAHAMSON and WILLIAM A. BABLITCH join in this concurrence.

STEINMETZ, J. (dissenting). I would return the case to the trial court for a new trial on the issue of liability because I find the trial court, by not striking the evidence of negligence of defendants when dismissing the negligence cause of action and by giving an erroneous

---

[2] In *Foley v. City of West Allis,* 113 Wis. 2d 475, 485–86, 335 N.W.2d 824 (1983), this court stated, "when there is a logical basis to allocate damages between two or more incidents and among various parties, courts attempt to do so." The opinion then cited the *Restatement (Second) of Torts,* sec. 443A, which specifies that: "(1) Damages for harm are to be apportioned among two or more causes *where* (a) *there are distinct harms* . . . ." (Emphasis supplied.) *Id.* at 486. The logical negative inference is that damages cannot be apportioned among causes where there are not separate or distinct harms.

[3] *Huddell v. Levin,* 537 F.2d 726 (3d Cir. 1976).

instruction on the duty to warn as to the use of seat belts, committed prejudicial error and that on retrial a different result is probable. The majority holds there was no prejudice even though the jury possibly could have considered the evidence of negligence in determining that the defect in the design of the seat system was unreasonably dangerous and possibly it could have entered into the jury's deliberations concerning the defectiveness of the seat system.

This is a difficult legal case made more difficult by the majority's opinion which I find to be confusing and without precedential value, and in this respect, I agree with the concurring opinion. The injuries to plaintiff are awesome and due deliberations should be given to allow him the right to a fair trial and to receive damages if he is entitled to them. I find it incomprehensible that the jury found under the facts of this case the plaintiff was not negligent for his own care and safety by failing to wear the available rear seat belt. The finding of no negligence is inconsistent with the facts of a head-on crash at a speed of 30 to 50 miles per hour while not wearing a seat belt and sustaining very serious injuries as a result of being propelled forward. The fact that plaintiff was affected by his failure to wear a seat belt is obvious and a finding of no negligence is inconsistent with the evidence and therefore is perverse.

In arriving at its decision, the majority has unnecessarily confused the law in this state as to second impact or enhanced injury doctrine. The evidence was adequate as presented by plaintiff's experts that plaintiff's quadriplegia was sustained as a result of the design defect. Bruce Enz testified that the entrapment and capturing capability of the seat backs and the failure of the bracket "enhanced" and caused the injury. Dr. Anthony Sances also testified that the plaintiff would

not have sustained his paralyzing injuries except for the design defects.

*Larsen v. General Motors Corp.,* 391 F.2d 495 (8th Cir. 1968) is cited by the majority to approve of the "basic premise behind all tort law which limits a defendant's liability to that portion of harm which he has in fact caused, as distinguished from harm arising from other sources." P. 350, *supra.* That represents the doctrine of enhanced injury since defendant is liable only for the harm or injury caused by that defendant.

The citations of *Arbet v. Gussarson,* 66 Wis. 2d 551, 225 N.W.2d 431 (1975) and *Schnabl v. Ford Motor Co.,* 54 Wis. 2d 345, 195 N.W.2d 602 (1972), are not relevant to the enhanced injury doctrine. In *Arbet,* there was one impact with a spontaneous concurrent ignition of fuel from the ruptured gasoline tank. The issue was the lack of safety in the design of the gas tank to withstand the impact. The case was at the pleading stage where all injuries sustained were alleged to have been caused by the design and manufacture defects. The pleading alleged neither plaintiff would have been injured if the station wagon had not been negligently designed. At that stage of the case, there was no issue of the divisibility of injuries and their respective causes.

In *Schnabl,* the seat belt was alleged faulty so that on impact the plaintiff was not restrained and we held it could have been a substantial factor in causing the death of the plaintiff. Again there was no separation from the one impact and the defective part of the automobile as in the instant second impact case. The injuries in *Arbet* and *Schnabl* both occurred in the initial impact and there was no separate impact after the vehicles came to a stop or were in the process of stopping. *Schnabl* also was concerned with the pleadings which alleged the death of the plaintiff was caused by

a faulty seat belt. In *Schnabl* we held that the trier of fact must decide the issue of whether delivery of a faulty seat belt could have been a substantial factor in causing the death even if it played no part in the accident. *Id.* at 353–54. To determine this issue, the jury would have had to decide whether the death was caused by the accident or the faulty seat belt. The injury sustained in *Schnabl* was death which was indivisible so that there could be no issue as to what part of the injury was caused by the accident or the defective seat belt. The issue was whether the accident or the seat belt or both were substantial factors in causing the death.

In citing *Arbet*, the majority states: "Under this doctrine, a manufacturer may be held strictly liable *for harm caused* by a defective product unreasonably dangerous to the user or consumer." Pages 351, 352, supra. (Emphasis added.) In further discussing *Arbet*, the majority states:

"The *Arbet* decision tells us that Sumnicht has a cause of action in strict liability against Toyota for all injuries which the defective seat system was a substantial factor in causing. *Arbet*, 66 Wis. 2d at 557. This premise forecloses recovery against Toyota for injuries sustained solely in the 'first collision,' because Toyota's defective seat system was not a proximate cause of the accident. Requiring Sumnicht to distinguish between the damages sustained in the 'first collision' and the 'second collision' is part and parcel of his burden of proving causation." Page 353, supra.

That reads to me like an acceptance of the second impact—enhanced injury doctrine in that the defendant is only liable for damages (injuries) sustained in the second impact and the plaintiff must separate in his proof the injuries sustained in the first and second impact.

The majority quotes *Larsen* for the proposition: "[T]he manufacturer should be liable for that portion of the damage or injury caused by the defective design *over and above* the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design." *Larsen*, 391 F.2d at 503. Page 354, supra. That is the enhanced injury doctrine and based on it, Toyota correctly asserts that its liability is nonexistent until the plaintiff shows the extent to which the injuries were enhanced by the defect.

The majority rejects the holding in *Huddell v. Levin*, 537 F.2d 726 (3d Cir. 1976). I find the three elements required by *Huddell* to be appropriate and necessary in an enhanced injury defective product case. They are:

"First, in establishing that the design in question was defective, the plaintiff must offer proof of an alternative, safer design, practicable under the circumstances. . . . Second, the plaintiff must offer proof of what injuries, if any, would have resulted had the alternative, safer design been used. . . . We agree in this regard with Judge Barlow in *Yetter v. Rajeski*, 364 F. Supp. 105, 109 (D.N.J. 1973) that 'it is absolutely necessary that the jury be presented with some evidence as to the extent of injuries, if any, which would have been suffered . . . had the plaintiff's hypothetical design been installed. . . .' Third, as a corollary to the second aspect of proof, the plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the defetcive design." *Id.* at 737–38.

None of these elements require the plaintiff to prove a negative fact as *Huddell* was criticized in *Mitchell v. Volkswagenwerk, AG,* 669 F.2d 1199, 1204–05 (8th Cir. 1982) relied on by the majority. All of the factors required by *Huddell* were satisfied by Sumnicht's evidence according to the majority's analysis. His experts testified there were alternative designs available which

were safe, *i.e.*, stronger metal in the seat support bracket hinge that broke, filler material was available for the opening between the seats, cushioning material was available for the critical seat support area. The experts also testified plaintiff's quadriplegia was caused *over and above* the other injuries sustained in the accident due to the design defect. These are the requirements of *Huddell*.

*Fox v. Ford Motor Co.*, 575 F.2d 774 (10th Cir. 1978), relied on by the majority to criticize *Huddell* incorrectly stated that *Huddell* "refused to follow the orthodox doctrines of joint liability of concurrent tort-feasors for injuries which flow from their concurring in one impact." Citing *Huddell*, 537 F.2d at 787. The *Fox* court missed the point in that *Huddell* was not considering joint liability of concurrent tort-feasors for injuries from one impact. *Fox* then went on at 787 to quote the Restatement of Torts and approve of enhanced injuries as follows: "Damages may be apportioned between the two causes if there are distinct harms or a reasonable basis for determining the causes of injury." Restatement of Torts, Second, sec. 433 A. The *Fox* court considered death an injury and held it is not a divisible injury in which apportionment is appropriate or possible. However, if the relative severity of the two impacts could be opined by experts, then certainly the experts could give an opinion as to which impact caused the death.

Neither *Mitchell* nor *Fox* disavow *Huddell* and yet the majority relies on them to reject two of the three requirements in *Huddell*. The requirements rejected are that a plaintiff in a "second collision" case must offer proof of what injuries, if any, would have resulted had an alternative, safer design been used and that the plaintiff must offer some method of establishing the

extent of enhanced injuries attributable to the defective design.

The majority states it is rejecting the enhanced injury doctrine as to special rules of necessary proof, (pages 357, 358, *supra*) and then states:

"The rule of strict liability, as adopted in Wisconsin, requires proof that the product was in a defective condition, unreasonably dangerous, which caused the plaintiff's harm. The long-standing test for cause in Wisconsin is whether the defect was a substantial factor in producing the injury. *Howes v. Deer & Company*, 71 Wis. 2d 268, 273, 238 N.W.2d 76 (1976)."

But that is the very issue that requires application of the enhanced injury doctrine. The question is which injuries were caused by the first impact and which by the second impact. The same inquiry of what harm of plaintiff is being considered was discussed in *Clark v. Leisure Vehicles, Inc.*, 96 Wis. 2d 607, 617–18, 292 N.W.2d 630 (1980), cited by the majority.

The majority states: "We affirm the applicability of the substantial factor test in proving causation." However, that begs the issue of considering the cause of what harm.

After disavowing *Huddell* and any rules tailored uniquely for second collision cases (pages 358, 359, *supra*), the court then states:

"In keeping with the law of this state, we hold that in a 'second collision' products liability case, the plaintiff must prove that the defective product was a substantial factor in causing the harm from which damages are claimed. The degree to which the plaintiff will be required to distinguish between the injuries sustained in the 'first collision' and those sustained in the 'second collision' will be governed by his burden of proving causation via the substantial factor test."

To do this, the jury must distinguish between injuries due to the first collision and those due to the second

collision and therefore what plaintiff's injuries would have been without the defect but with the alternative, safer design. That proof was submitted by plaintiff's experts in this case. If there is no safer design available or possible, then the products defendant should not be liable. The majority states: "For instance, Toyota's defective seat system did not cause the accident in this case, and, therefore, Toyota is not liable for injuries caused solely from the 'first collision.' " (Page 359, *supra.*) That statement admits that the jury will have to decide what injuries were caused by the first collision so that Toyota is not held liable for them. That is a part of the enhanced injury doctrine and why the usual substantial factor test is not sufficient unless the proof is sufficient to allow the jury to distinguish between the injuries sustained with the defect and what would have been sustained with the safer, alternative design or condition of the product.

The majority at p. 361 of the opinion rejects the use of the "over and above" language contained in the jury's verdict and then devotes pages to analyzing the evidence to see if it was sufficient to sustain a jury answer to a question not asked and that is whether Toyota's defective seat system was a substantial factor in causing plaintiff's quadriplegia.

There is no doubt in this case that a second collision was involved when the plaintiff's body hit the rear of the front seat as it did after the initial 30 to 50 mile per hour head-on impact against a tree. The experts testified convincingly for the jury that one purpose of the rear of the front seat is to compartmentalize hurtling human bodies which are sitting or lying on the rear seat at the time of the first impact. The design of the front seat, therefore, is not only to support the front seat passenger in normal conditions but also to limit the injuries to all occupants of the car in im-

pact situations. The design must be to control as safely as possible the movement in all directions of passengers in the rear of the automobile in normal and violent circumstances.

The majority states at p. 364 of the opinion that plaintiff suffered inconsequential injuries besides his severed spine. This was testified to by plaintiff's experts and serves as the basis for the enhanced injury doctrine rejected by the majority. That proof was not necessary, according to the majority, since it agrees with plaintiff's attorney who stated this was not an enhanced injury case since the seat defect caused plaintiff's entire injuries. But the trial judge treated the case as one of enhanced injury since he found it reasonable to say that the jury believed that if the seats had been properly engineered, the plaintiff would have sustained practically no injuries. Later on p. 366 of the opinion, the majority returns to its inconsistent position that the defective seat system did not "enhance" plaintiff's injuries because, but for the defect, "there were no injuries to enhance."

Toyota relied partially on plaintiff not proving "an alternative, safer design, [was] practicable under the circumstances." But plaintiff's experts did testify as to the availability of a desired use of filler between the seats, padding material and stronger metal for the seat hinges all of which are alternative, safer, practicable designs as the jury could accept that proof.

In conclusion, I am disturbed by the majority's unnecessary treatment of the law of enhanced injuries and its confusing analysis. I would order a new trial as to liability because errors committed during the trial misled the jury as to the evidence of negligence and should have been stricken and the jury told to disregard, because an erroneous instruction was given to the jury, and lastly, because the jury's answer, finding the plain-

tiff not negligent in regard to his failure to wear a seat belt and his own care and safety, was inconsistent with the facts of this violent accident.