CUDAHY, Circuit Judge,
concurring in part and dissenting in part.
Although the majority presents an insightful commentary on much of the evidence, it seems to me in addressing strict liability to have lost sight of the demands of summary judgment. As we all know, summary judgment requires that, after viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Further, summary judgment is inappropriate “if the evidence is such that a reasonable jury could return a verdict for the nonmoving party,” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and a number of the conclusions that the majority accepts as clear simply fail to reach a degree of certitude such that no reasonable juror could conclude to the contrary. In fact, the state of public appreciation of various health risks from cigarette smoking fifty or more years ago is so indeterminate as to make summary judgment on the subject extraordinarily difficult.
To succeed on their strict liability claim, the plaintiffs would have to show that “the average consumer [did not] fully appreciate the attendant risk of injury” associated with smoking. Sumnicht v. Toyota Motor Sales, 121 Wis.2d 338, 360 N.W.2d 2, 16 (1984). Under this standard, the central question, in its most general terms, is how detrimental to long-term health did the average beginning smoker fifty years ago view cigarette smoking? Cigarettes were called “coffin nails” as far back as I can remember, but that certainly does not mean that they were firmly linked to cancer fifty years ago. Cigarettes were thought to contribute to various respiratory ailments, and they were believed to be inconsistent with serious athletic training,[1] but a tie to lung cancer or heart disease was not yet in the public mind. In fact, the tobacco companies did their best to keep these links out of the spotlight. In 1954, the tobacco companies got together to publish their notorious “Frank Statement” in which they stated that “there is no proof that cigarette smoking is one of the causes [of lung cancer].... We believe the products we make are not injurious to health.” T. Ex. 14145.[2] In 1972, the *609 Tobacco Institute patted itself on the back for this disinformation campaign in a memorandum, calling it “brilliantly conceived and executed” and “creating doubt about the health charge without actually denying it.” T. Ex. 20987. Thus, it seems that the defendants tried to keep the full risks of cancer from the public. At earlier stages in this litigation, plaintiffs argued that beginning smokers did not fully appreciate the general health risks — knowing that smoking would likely make a person short of breath or cough-prone is far short of fully appreciating that smoking could likely be fatal. But the majority asserts that the issues of health-risk appreciation have been narrowed to knowledge of addictiveness. Based on the arguments before this panel, I can accept this focus, but I do not believe that limiting the inquiry to awareness of addictiveness gets us closer to granting summary judgment.
In the majority’s view, the key part of the strict liability analysis involves the question whether beginning smokers (whether “teenagers” or “adults” — I’ll discuss this in a moment) regarded cigarette smoking as either habit forming or addictive — and whether these two attributes are synonyms in the mind of the average .beginning smoker. The majority answers this question by first noting the plaintiffs’ concession that the average American saw cigarettes as “habit forming” — a quality seen by the plaintiffs as quite distinguishable from “addictive.” The majority then makes this concession a lever for summary judgment by describing the difference between a “habit” and an “addiction” as “esoteric.” The majority also regards the difference between “habit forming” and “addictive” as “a semantical distinction beyond the grasp of our Average Joe.”
Possibly things are that simple, but it is also entirely possible that the ordinary beginning smoker associated “habit forming” with the yen for bon-bons, pistachio nuts or cups of coffee but thought of heroin and cocaine when “addiction” was mentioned. The unbreakable bondage to hard drugs was probably in most minds of quite a different order than everyday habits— at least a reasonable jury could so conclude. The plaintiffs did provide some evi■dence that beginning smokers were unaware that cigarettes were addictive,[3] see, e.g., Supp.App. at 58 (Affidavit of Dr. John H. Greist) (“I have found that most [smokers] were unaware of the highly addictive nature of cigarette smoke until after they are addicted.”); T. Ex. 13677 (Brown & Williamson marketing memorandum from 1978) (“Very few customers are aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison.”); T. Ex. 12408(R.J. Reynolds planning memorandum, entitled “The Nature of the Tobacco Business and the Crucial Role of Nicotine,” written in 1972) (“[Nicotine and secondary physical and manipulative gratifications are unknown and/or largely unexplained to the [beginning smoker]. He does not start smoking to obtain undefined physiological gratifications or reliefs, and certainly he does not start smoking to satisfy a non-existent craving for nicotine.”), and it seems to me that the state of mind of the beginning smoker on this subject from 1935 to 1960 is not something that lends itself easily to summary judgment — even if the evidence offered by the plaintiffs is not overwhelmingly persuasive.
The majority points to no evidence that suggests that this habit/addiction distinction was “beyond the grasp of our Average Joe.” In making this assumption in favor *610 of the defendants, the majority has not only unfairly demeaned the sagacity of the proverbial Joe but has also ignored the mandate of summary judgment that a court draw “all reasonable inferences in favor of the nonmoving party.” Anderson, 477 U.S. at 255, 106 S.Ct. 2505. Far from thinking it “esoteric,” medical professionals have understood the habit/addiction distinction for years, and, until fairly recently, they thought cigarettes were merely “habit forming.” Compare A.App. at 56(1964 Surgeon General’s Report) (“In medical and scientific terminology [the smoking process] should be labeled habituation to distinguish it clearly from addiction, since the biological effects of tobacco, like coffee and other caffeine-containing beverages, betel-morsel chewing and the like, are not comparable to those produced by morphine, alcohol, barbiturates, and other potent addicting drugs”) (emphasis in original) with A.App. at 58 (1988 Surgeon General’s Report) (“Cigarettes ... are addicting.... The pharmacological and behavioral processes that determine tobacco addiction are similar to those that determine addiction to drugs such as heroin and cocaine.”). Whether the Average Joe, beginning smoker regarded cigarettes as being habit forming or addictive or saw no distinction between these two concepts fifty years ago is the kind of comparative question that should be left to a jury.
Whether the standard beginning smoker should be taken to be a “teenager,” as the plaintiffs argue, or an “adult,” as the majority determines, also needs to be addressed.[4] Here again the requirements of summary judgment seem to be taken lightly by the majority. The majority makes the curious statement that “[mjost smokers do begin smoking in their teens, but the record does not reflect this.” In other words, it is common knowledge that the typical beginning smoker is a teenager, but somehow the record of this case allows a grant of summary judgment based in part on the thesis that such a smoker is older and better-informed about the dangers of smoking and the addictiveness of cigarettes. Thus, the path towards summary judgment can be smoothed by adopting factual assumptions somehow more credible than common knowledge. This is very implausible, and there is more than enough evidence to support the hypothesis that beginning smokers became addicted when they were still children without any warning of the powerful addiction to which they were becoming subject. First of all, plaintiffs produced evidence that the tobacco companies themselves targeted teenagers as beginning smokers or were, at the very least, aware that smokers begin in their teens. See, e.g., T. Ex. 10299(presen-tation to Philip Morris Board of Directors in 1969) (“The 16 to 20-year old begins smoking for psychosocial reasons.”); Supp. App. at 68 (Summary of Expected Expert Testimony of Richard W. Pollay) (“[T]he tobacco industry has long displayed a strategic interest in the youth market.”). And although the majority acknowledges that the plaintiffs’ evidence shows that “30 percent to 35 percent of high school seniors in 1958 and 1966 smoked,” it dismisses this evidence as both “imprecise” and “not pertinent to the question of what percentage of smokers began smoking as teenagers.” The majority is correct that this is not direct evidence of exactly how many smokers began smoking as teenagers, but when one considers that the plaintiffs also introduced evidence that only 6 percent of smokers quit each year, see T. Ex. 0054, attached to R.277: Ex. B (Jorenby et ah, A Controlled Trial of Sustained-Release Bu-propion, a Nicotine Patch, or Both for Smoking Cessation, New Eng. J. Med. 340:9 at 685-91 (May 4,1999)), a jury could reasonably be left with the conclusion that the vast majority of these high-school *611 smokers kept smoking through their adult lives. Therefore, I believe that the majority was hasty, and wrong, to determine as a matter of law that the “beginning smoker” must mean the “adult beginning smoker.”
For these reasons, I respectfully dissent from the majority’s analysis and conclusions respecting strict liability.

. But cigarette advertising certainly tried to convey the opposite. For example, in 1952, the American Tobacco Company ran the following advertisement: "Frank Gifford in Action ... The young N.Y. Giant halfback was already a top star — and a Lucky Strike smoker." See Supp.App. at 61 (Summary of Expected Testimony of Richard W. Pollay).

. Citations to the record come from three sources: (1) appellants' appendix, cited as "A. App. at [page];” (2) appellee's supplemental appendix, cited as “Supp.App. at [page];” or (3) what would have been plaintiffs' trial exhibits, cited as "T. Ex. [number].” All trial exhibits cited can be found in the record attached as part of Exhibit A to R.277, unless otherwise specified.

. The plaintiffs also provided some evidence that cigarette manufacturers were well-aware of the addictive quality of cigarettes but failed to share it with the public. See, e.g., T. Ex. 10299 (report to Philip Morris Board of Directors in 1969) (''[T]he ultimate explanation for the perpetuated cigarette habit resided in the pharmacological effect of smoke upon the body of the smoker.”); T. Ex. 259 (internal memorandum by general counsel for Brown & Williamson, 1963) ("[NJicotine is addictive. We are, then, in the business of selling ... an addictive drug.”).

. This matters because the plaintiffs produced evidence that the age of the smoker has some bearing on smokers’ perceptions. See, e.g., Supp. App. at 69-70 (Summary of Expected Expert Testimony of Richard W. Pollay) ("Cigarette advertising affects teens more than adults,” citing articles).